[No. H031658. Sixth Dist. Feb. 5, 2009.]

COUNTY OF SANTA CLARA et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
CALIFORNIA FIRST AMENDMENT COALITION, Real Party in Interest.

COUNSEL

Ann Miller Ravel, County Counsel, and Robert A. Nakamae, Deputy County Counsel, for Petitioners.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Holme Roberts & Owen, Roger Myers, Rachel Matteo-Boehm and Kyle Schriner for Real Party in Interest.

Davis Wright Tremaine, Mary Duffy Carolan and Jeff Glasser for California Newspaper Publishers Association, Los Angeles Times Communications LLC, Freedom Communications, Inc., Copley Press, Inc., The Bakersfield Californian, The Press-Enterprise, MediaNews Group, The Reporters Committee for Freedom of the Press and National Freedom of Information Coalition as Amici Curiae on behalf of Real Party in Interest.

Jenner & Block, Paul M. Smith, Iris E. Bennett, Daniel I. Weiner and Peter H. Hanna for The National Security Archive and Center for Democracy & Technology as Amici Curiae on behalf of Real Party in Interest.

Marcia Hoffmann for Electronic Frontier Foundation as Amicus Curiae on behalf of Real Party in Interest.

Meyer, Klipper & Mohr, Michael R. Klipper, Christopher A. Mohr; Coblentz Patch Duffy & Bass and Jeffrey G. Knowles for American Business Media, Choicepoint Asset Company LLC, First American CoreLogic, National Association of Professional Background Screeners, Real Estate Information Professionals Association, Reed Elsevier and Software & Information Industry Association as Amici Curiae on behalf of Real Party in Interest.

Timothy S. Guster for Seventy Seven GIS Professionals and Great Oaks Water Co. as Amici Curiae on behalf of Real Party in Interest.

OPINION

**McADAMS, J.**—This writ proceeding raises weighty questions of first impression, which illuminate tensions between federal homeland security provisions and our state's open public record laws. This proceeding also requires us to consider a state law exemption allowing nondisclosure in the

public interest; the impact of copyright claims on disclosure; and the extent to which charges for electronic public records may exceed reproduction costs. After analyzing these important and novel issues, we conclude that the law calls for unrestricted disclosure of the information sought here, subject to the payment of costs to be determined by the trial court.

## INTRODUCTION

The writ proceeding before us was instituted by the County of Santa Clara and its executive, Peter Kutras, Jr. (collectively, the County). The County seeks extraordinary relief from a superior court order filed in May 2007, requiring it to disclose its geographic information system "basemap" to the real party in interest, California First Amendment Coalition (CFAC). Having stayed the 2007 order, we issued an order to show cause in March 2008, to which CFAC and the County responded.

The County's petition in this court rests on three main legal arguments, which are asserted in the alternative: (1) paramount federal law promulgated under the Homeland Security Act of 2002 (6 U.S.C. § 101 et seq.) protects the information from disclosure; (2) the requested information is exempt from disclosure under the California Public Records Act (Gov. Code, § 6250 et seq.); (3) even if disclosure is required, the County can place restrictions on disclosure under state law provisions recognizing its copyright interests, and it can demand fees in excess of reproduction costs.

After considering the extensive record, the arguments raised by the parties, and the submissions by numerous amici curiae, we conclude that the County is not entitled to the relief sought. We therefore deny the County's writ petition on the merits. However, we will remand the matter to the superior court for a determination of whether and to what extent the County may demand fees in excess of the direct costs of reproducing the electronic record requested by CFAC.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 12, 2006, CFAC submitted a request for a copy of the County's geographic information system (GIS) basemap.[1] The request was made under the California Public Records Act (CPRA), Government Code section 6250

---

[1] As described in the County's 2002 GIS strategic plan: "Geographic information systems (GIS) are a class of information technology that has been widely adopted throughout government and business sectors to improve the management of location-based information." As further explained in that document: "GIS is an information management technology that combines computer mapping and database technologies to improve the management and

et seq. Two weeks later, the County denied the request, citing statutory exemptions and copyright protection.

On August 16, 2006, CFAC renewed its request for the GIS basemap, with some modifications. Later that month, the County denied the renewed request.

*Proceedings in the Superior Court*

On October 11, 2006, CFAC filed a petition for writ of mandate, seeking to compel the County to produce the GIS basemap. Among the exhibits attached to the petition was the County's GIS basemap data request form, which details the procedure and the required fees for obtaining that data. Based in part on the fee schedule contained in that form, CFAC asserted that the cost of obtaining countywide parcel information alone "would be approximately $250,000." As legal support for its petition, CFAC relied on the CPRA, and on the California Constitution, article I, section 3. The County answered, then CFAC filed its replication to the answer.

In January 2007, CFAC moved for judgment on its petition. The County opposed the motion, and CFAC replied. At a hearing held in February 2007, the court authorized the County to file a supplemental response, which it did the following month. CFAC successfully sought an opportunity to reply.

The trial court thereafter conducted two further hearings in April 2007. A substantial volume of evidence and argument was presented to the trial court.

On May 18, 2007, the trial court filed a 27-page written order.

In its factual findings, the court described GIS and the GIS basemap. The court determined that the County "sells the GIS basemap to members of the public for a significant fee and requires all recipients to enter into a mutual non-disclosure agreement." Later in its order, the court observed that the County had "actually entered into agreements with 18 different entities, 15 of those being government entities."

Addressing the legal issues, the court noted both parties' agreement that "the resolution of this dispute turns on whether the public record is exempt."

analysis of location based information." Among the essential geographic elements of the GIS basemap are "parcels, streets, assessor property information, jurisdictional boundaries, ortho-photos [aerial photographs], and buildings."

According to a declaration submitted by the County in the proceedings below: "The GIS Basemap starts with the Assessor's map data, and builds layers of information onto it. The 'GIS Basemap' is a computer mapping system that (1) tells the hardware where to gather information from a variety of separate databases and (2) tells the hardware how to intelligently render the various bits of data into a structured output format."

The court then discussed various proffered CPRA exemptions, ultimately rejecting them all for different reasons.

Having found that no exemption was available under the CPRA, the court ordered the County to provide CFAC with the GIS basemap, at the County's direct cost. The court stayed the order until June 25, 2007, to permit the parties to pursue appellate review.

*Proceedings in This Court*

On June 12, 2007, the County initiated this writ proceeding.[2] It filed a petition accompanied by a memorandum of points and authorities. At the County's request, we issued a temporary stay. CFAC filed preliminary opposition, to which the County replied.

*Order to Show Cause; Responses*

In March 2008, we issued an order to show cause to the respondent superior court, inviting opposition by CFAC as the real party in interest.

CFAC filed a return in April 2008, to which the County replied the following month.

Numerous amici curiae applied for leave to file five separate briefs in this court. We granted all five applications.[3]

*The Record*

In connection with its June 2007 petition in this court, the County filed an eight-volume petitioner's appendix consisting of nearly 2,000 pages. The following month, we granted the County's request to augment the record with transcripts of the two hearings conducted by the superior court in April 2007.

---

[2] The CPRA contains a provision for expedited appellate review by extraordinary writ only. (Gov. Code, § 6259, subd. (c); *Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 426–427 [121 Cal.Rptr.2d 844, 49 P.3d 194].) The scope of review is the same as for direct appeals. (*State Bd. of Equalization v. Superior Court* (1992) 10 Cal.App.4th 1177, 1185 [13 Cal.Rptr.2d 342].)

[3] One brief was filed in support of the County by two amici curiae, the California State Association of Counties and the League of California Cities. The other four amicus curiae briefs were offered in support of CFAC, by (1) the California Newspaper Publishers' Association, and various news and other organizations; (2) the National Security Archive, the Center for Democracy and Technology, and the Electronic Frontier Foundation; (3) American Business Media et al., commercial and nonprofit entities that compile public records for various uses; and (4) 77 GIS professionals.

In 2008, we received and granted three requests for judicial notice.[4] Despite having taken judicial notice of these documents, we need not rely on them in resolving this proceeding. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261]; see also *Windham at Carmel Mountain Ranch Assn. v. Superior Court* (2003) 109 Cal.App.4th 1162, 1173, fn. 11 [135 Cal.Rptr.2d 834]; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 [34 Cal.Rptr.3d 520].)

## CONTENTIONS

As indicated above, the County offers three grounds to support its petition, which asserts trial court error in mandating disclosure of its GIS basemap.

The County's first argument relies on federal law, including the Critical Infrastructure Information Act of 2002. According to the County, that statute and its accompanying regulations preempt state law. And under those superseding federal provisions, disclosure of the GIS basemap is prohibited, because it has been validated by the United States Department of Homeland Security as protected critical infrastructure information.

The County's second argument is based on state law, the CPRA. According to the County, even if the CPRA is not preempted by federal law, its "catchall" exemption shields the GIS basemap from public disclosure.

As the third ground for its petition, the County posits that even if neither preemption nor exemption supports nondisclosure, it should be allowed (a) to

---

[4] The first request for judicial notice was submitted by the County's amici curiae, the California State Association of Counties and the League of California Cities. The subject of this request for judicial notice is the legislative history of Assembly Bill No. 3265 (1987–1988 Reg. Sess.) (Stats. 1988, ch. 447, p. 1836), which enacted Government Code section 6254.9, part of the CPRA. We received and granted this request for judicial notice in June 2008. Shortly thereafter, CFAC opposed the request and moved for reconsideration. In doing so, CFAC expressed no objection "to the Court's taking judicial notice of legislative history materials that may be pertinent to showing the intent of the Legislative as a whole when enacting the bill." But it argued that a large number of documents included in the request for judicial notice fail to satisfy that standard. In opposing the motion for reconsideration, petitioner's amici curiae urged the propriety of noticing one particular document targeted by CFAC, a 1988 memorandum from the City of San Jose, which sponsored the bill. In reply, CFAC disagreed with amici curiae's assessment of the 1988 memorandum.

The second request for judicial notice was made by CFAC's amici curiae, the California Newspaper Publishers' Association et al.; it was received and granted in June 2008. Attached to that request are 10 newspaper articles, offered "to establish the widespread use of GIS basemap data in reporting, which is relevant to this Court's Government Code § 6255 inquiry into the public interest served by releasing GIS basemap data."

The third request for judicial notice was filed by the County in July 2008. It asks this court to judicially notice documents from the United States Copyright Office demonstrating that two California cities have registered copyrights.

demand end user agreements, because the GIS basemap is copyrightable, and (b) to recover more than its direct cost of providing the record, based on a provision of the CPRA.

## DISCUSSION

Addressing each of the County's three contentions in turn, we first provide an overview of the relevant general principles of law. We then set forth the parties' arguments in greater detail, followed by our analysis.

I. *Federal Homeland Security Law*

A. *Overview*

1. *The Statute*

■ The federal statute at issue here is the Critical Infrastructure Information Act of 2002 (CII Act). (6 U.S.C. §§ 131–134.) The CII Act is part of the Homeland Security Act of 2002, which established the Department of Homeland Security (DHS). (See 6 U.S.C. §§ 101, 111(a).) Within the DHS, Congress established an Office of Intelligence and Analysis and an Office of Infrastructure Protection. (6 U.S.C. § 121(a).) The statutory responsibilities associated with those offices include carrying out "comprehensive assessments of the vulnerabilities of the key resources and critical infrastructure of the United States," and developing "a comprehensive national plan for securing the key resources and critical infrastructure of the United States, including power production, generation, and distribution systems, information technology and telecommunications systems (including satellites), electronic financial and property record storage and transmission systems, emergency preparedness communications systems, and the physical and technological assets that support such systems." (*Id.*, § 121(d)(2), (5).)

■ At the heart of the CII Act is the protection of critical infrastructure information (CII), statutorily defined as "information not customarily in the public domain and related to the security of critical infrastructure or protected systems . . . ." (6 U.S.C. § 131(3).) "The CII Act authorized DHS to accept information relating to critical infrastructure from the public, owners and operators of critical infrastructure, and State, local, and tribal governmental entities, while limiting public disclosure of that sensitive information under the Freedom of Information Act . . . and other laws, rules, and processes." (71 Fed.Reg. 52262 (Sept. 1, 2006), citation omitted.)

The CII Act contains a section aimed at protecting voluntarily shared CII. (6 U.S.C. § 133.) Concerning the disclosure of such information, it provides

in pertinent part: "Notwithstanding any other provision of law, critical infrastructure information (including the identity of the submitting person or entity) that is voluntarily submitted to [the DHS] for use by that agency regarding the security of critical infrastructure and protected systems . . . [¶] (A) shall be exempt from disclosure under . . . the Freedom of Information Act . . ." and "(E) shall not, if provided to a State or local government or government agency . . . [¶] . . . be made available pursuant to any State or local law requiring disclosure of information or records." (*Id.*, § 133(a)(1)(A), (E)(i); see O'Reilly, 1 Federal Information Disclosure 3d (Dec. 2008 supp.) § 13:14, p. 417 [describing this provision as a "much-tinkered clause" that was "hotly contested as the bills were debated"].)

The CII Act directs the DHS to "establish uniform procedures for the receipt, care, and storage by Federal agencies of critical infrastructure information that is voluntarily submitted to the Government." (6 U.S.C. § 133(e)(1).) It further provides that those procedures "shall include mechanisms" for "the protection and maintenance of the confidentiality of such information so as to permit the sharing of such information within the Federal Government and with State and local governments, and the issuance of notices and warnings related to the protection of critical infrastructure and protected systems, in such manner as to protect from public disclosure the identity of the submitting person or entity, or information that is proprietary, business sensitive, relates specifically to the submitting person or entity, and is otherwise not appropriately in the public domain." (*Id.*, § 133(e)(2)(D).)

### 2. Regulations

The federal regulations implementing the CII Act are found in the Code of Federal Regulations, volume 6, part 29 (2009). Those regulations are intended to implement the federal statute "through the establishment of uniform procedures for the receipt, care, and storage of Critical Infrastructure Information (CII) voluntarily submitted to the Department of Homeland Security (DHS)." (6 C.F.R. § 29.1(a) (2009).)

As stated in the regulations: "Consistent with the statutory mission of DHS to prevent terrorist attacks within the United States and reduce the vulnerability of the United States to terrorism, DHS will encourage the voluntary submission of CII by safeguarding and protecting that information from unauthorized disclosure and by ensuring that such information is, as necessary, securely shared with State and local government pursuant to . . . the CII Act. As required by the CII Act, these rules establish procedures regarding: . . . [¶] . . . The receipt, validation, handling, storage, proper marking and use of information as PCII . . . ." (6 C.F.R. § 29.1(a) (2009).)

Protected CII (PCII) is CII that has been validated by DHS. (6 C.F.R. § 29.2(g) (2009).)

Among the regulations is one relied on by the County, which states that PCII "shall be treated as exempt from disclosure under the Freedom of Information Act and any State or local law requiring disclosure of records or information." (6 C.F.R. § 29.8(g) (2009).)

### 3. *Preemption*

The County's reliance on federal law rests on its contention that the CII Act and accompanying regulations preempt the CPRA.

■ As a general principle, federal law preempts state law (1) where Congress has said so explicitly, (2) where Congress has said so implicitly, as when federal regulation occupies the field exclusively, and (3) where federal and state law conflict. (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 541 [150 L.Ed.2d 532, 121 S.Ct. 2404].) Unless Congress has demonstrated a clear and manifest purpose to the contrary, the presumption is that federal law does not preempt the states' historic police powers. (*Id.* at pp. 541–542; *Jevne v. Superior Court* (2005) 35 Cal.4th 935, 949–950 [28 Cal.Rptr.3d 685, 111 P.3d 954].) Moreover, a federal "agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." (*Louisiana Public Service Comm'n v. FCC* (1986) 476 U.S. 355, 374 [90 L.Ed.2d 369, 106 S.Ct. 1890].)

### B. *The Parties' Contentions*

### 1. *Preemption*

The County claims express federal preemption under 6 Code of Federal Regulations, part 29.8(g) (2009), which exempts PCII from the operation of federal, state, and local laws requiring the disclosure of public records. As the County points out, the preamble to the final rule promulgated by DHS notes "the preeminence of PCII status under the CII Act and these regulations in relation to any State, territorial, or tribal public disclosure laws or policies." (71 Fed.Reg., *supra*, at p. 52268.) That same document also states: "This rulemaking, as required by the underlying statute, preempts State, local and tribal laws that might otherwise require disclosure of PCII . . . ." (*Id.* at p. 52271; see also O'Reilly, 2 Federal Information Disclosure 3d, *supra*, § 27.22.)

The County also asserts that Congress has implicitly preempted state law, arguing that "the Federal Regulations set forth a scheme for PCII validation

that is so pervasive, it is unreasonable to infer that Congress intended the states to occupy the field." (See *Jevne v. Superior Court, supra,* 35 Cal.4th at p. 958.)

CFAC disputes the County's preemption claim. In its view, "the CII Act does not preempt" the CPRA, but "merely creates a rule of nondisclosure" that has no application to this case.

### 2. *Statutory Arguments*

According to CFAC, the County's position rests on a misreading of the federal act as it relates to CII that has been voluntarily submitted to the federal government, such as the GIS basemap at issue here. (See 6 U.S.C. § 133(a).) In CFAC's view, the provisions in the federal statute limiting disclosure apply only to those entities *receiving* PCII from DHS, not to those *submitting* it. Furthermore, CFAC argues, the federal protection for CII has been incorporated into state law as an exemption in the CPRA, but that exemption was waived by the County's sale of the GIS basemap to nongovernmental entities. (See Gov. Code, §§ 6254, subds. (k) [provision incorporating federal law exemptions], (ab) [provision exempting CII], 6254.5 [waiver provision].)

The County disputes this view of the CII Act, arguing that it imposes "an artificial distinction" between submitting and receiving entities. The County also dismisses CFAC's waiver argument, calling it "irrelevant" given federal preemption of the CPRA.

### C. *Analysis*

We agree with CFAC that the pertinent question here is not whether federal homeland security law trumps state disclosure law. Instead, the analysis in this case turns on whether the federal act and accompanying regulations apply at all. As we now explain, we conclude that the CII Act does not apply here because the County is a *submitter* of CII, not a *recipient* of PCII. Given that conclusion, we need not consider whether the CII Act preempts the CPRA.

### 1. *Federal law distinguishes between submitters and recipients of PCII.*

In undertaking our statutory analysis, we begin by examining the language of the relevant provisions. (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].) Statutory interpretation presents a legal

question, which we decide de novo. (*Ibid.*; *Los Angeles Unified School Dist. v. Superior Court* (2007) 151 Cal.App.4th 759, 767 [60 Cal.Rptr.3d 445].)

The CII Act provides that CII that has been voluntarily submitted "shall be exempt from disclosure" under the federal Freedom of Information Act (5 U.S.C. § 552 et seq.). (6 U.S.C. § 133(a)(1)(A).) As more particularly relevant here, it also prohibits disclosure of PCII "pursuant to any State or local law requiring disclosure of information or records"—but only "if provided *to* a State or local government . . . ." (*Id.*, § 133(a)(1)(E)(i), italics added.)

We are not aware of any case law interpreting this provision. But the regulations promulgated under the CII Act bear out the statute's apparent distinction between the submission of CII and the receipt of PCII, as we now explain.

We begin with the specific regulation cited by the County, 6 Code of Federal Regulations, part 29.8 (2009). Subdivision (g) of that regulation provides in part that PCII "shall be treated as exempt from disclosure under the Freedom of Information Act and any State or local law requiring disclosure of records or information." (6 C.F.R. § 29.8(g) (2009).) We acknowledge that subdivision (g) does not distinguish between CII submitters and PCII recipients. But another subdivision of this regulation does reflect that distinction.

Subdivision (b) of 6 Code of Federal Regulations, part 29.8 thus states in pertinent part: "PCII may be provided *to* a state or local government entity for the purpose of protecting critical infrastructure or protected systems . . . ." (6 C.F.R. § 29.8(b) (2009), italics added.) "The *provision* of PCII to a State or local government entity will normally be made only pursuant to an arrangement with the PCII Program Manager providing for compliance . . . and acknowledging the understanding and responsibilities of the *recipient*. State and local governments *receiving* such information will acknowledge in such arrangements the primacy of PCII protections under the CII Act . . ." and "agree to assert all available legal defenses to disclosure of PCII under State, or local public disclosure laws, statutes or ordinances . . . ." (*Ibid.*, italics added.)

This emphasis on recipients of PCII also appears at subdivision (d) of the same regulation, which provides: "State and local governments *receiving* information marked 'Protected Critical Infrastructure Information' shall not share that information . . ." except as allowed by the regulations. (6 C.F.R. § 29.8(d)(1) (2009), italics added.) On the subject of enforcement, subdivision (d) of the next regulation states: "if the PCII Program Manager determines that an entity or person who has *received* PCII has violated the provisions of

this Part or used PCII for an inappropriate purpose, the PCII Program Manager may disqualify that entity or person from future receipt of any PCII or future receipt of any sensitive homeland security information . . . ." (*Id.*, § 29.9(d)(2), italics added.)

Other regulations reflect the same dichotomy between the submission of CII and the receipt of PCII, as the following excerpts demonstrate. "The regulations in this Part apply to all persons and entities that are authorized to handle, use, or store PCII or that otherwise *accept receipt* of PCII." (6 C.F.R. § 29.1(b) (2009), italics added.) The regulations help ensure that CII is "securely *shared with* State and local government pursuant to . . . the CII Act." (*Id.*, § 29.1(a), italics added.) "A Federal, State or local agency that *receives* PCII may utilize the PCII only for purposes appropriate under the CII Act, including securing critical infrastructure or protected systems." (*Id.*, § 29.3(b), italics added.) "All Federal, State and local government entities shall protect and maintain information as required by these rules or by the provisions of the CII Act when that information *is provided to the entity* by the PCII Program Manager . . . ." (*Id.*, § 29.5(c), italics added.)

The preamble to the final regulations likewise confirms the submitter/recipient distinction. For example, it clarifies that "State, local and tribal contractors" are not "precluded from *receiving* PCII" and it notes a change in the final regulations "to permit employees of Federal, State, local, and tribal contractors who are engaged in the performance of services in support of the purposes of the CII Act, to communicate with a *submitting* person . . . when authorized by the PCII Program Manager or . . . designee." (71 Fed.Reg., *supra*, at p. 52269, italics added.)

Taken as a whole, this consistent and pervasive regulatory language supports our construction of the relevant provision of the CII Act, 6 United States Code section 133(a)(1)(E)(i). As we interpret that provision, it draws a distinction between the submission of CII and the receipt of PCII. In the hands of the submitter, the nature of the information remains unchanged; in the hands of the governmental recipient, it is protected from disclosure.[5]

This interpretation is also consonant with other aspects of the statute and regulations, particularly those that limit the uses of PCII in the hands of governmental recipients. As provided in the statute, PCII provided to a state or local government or agency shall not "be used other than for the purpose of protecting critical infrastructure or protected systems, or in furtherance of

---

[5] As one commentator observed in the context of voluntary submissions of CII by private industry, "firms cannot use DHS as a 'black hole' in which to hide information that would otherwise have come to light . . . ." (Bagley, *Benchmarking, Critical Infrastructure Security, and the Regulatory War on Terror* (2006) 43 Harv. J. on Legis. 47, 57, fn. omitted.)

an investigation or the prosecution of a criminal act." (6 U.S.C. § 133(a)(1)(E)(iii).) The regulations are to the same effect: "A Federal, State or local agency that receives PCII may utilize the PCII only for purposes appropriate under the CII Act, including securing critical infrastructure or protected systems." (6 C.F.R. § 29.3(b) (2009).) If the GIS basemap constitutes PCII in the County's hands, as it maintains, then federal law strictly restricts use of that data to the narrow purposes enumerated in the CII Act.

In sum, we conclude that the CII Act distinguishes between submitters of CII and recipients of PCII, with the result that the federal statute's prohibition on disclosure of protected confidential infrastructure information applies only when it has been *"provided to* a State or local government or government agency . . . ." (6 U.S.C. § 133(a)(1)(E), italics added.)

> 2. *Because the County did not receive PCII, the federal provisions do not apply.*

In this case, the information at issue was submitted *by* the County, not *to* it. Because the County is a submitter of CII, not a recipient of PCII, neither the CII Act nor the accompanying regulations apply here.

Having concluded that federal homeland security law does not apply in this case, we turn to the County's contention that the CPRA exempts the GIS basemap from disclosure.

## II. *State Law Disclosure Exemption*

As before, we summarize the governing law, then we describe and analyze the parties' contentions.

### A. *Overview*

"In 1968, the Legislature clarified the scope of the public's right to inspect records by enacting the CPRA." (*County of Los Angeles v. Superior Court* (2000) 82 Cal.App.4th 819, 825 [98 Cal.Rptr.2d 564].) "The CPRA 'replaced a hodgepodge of statutes and court decisions relating to disclosure of public records.' " (*Los Angeles Unified School Dist. v. Superior Court, supra,* 151 Cal.App.4th at p. 765.) The CPRA is codified in the Government Code, starting at section 6250.[6]

#### 1. *Policy Favoring Disclosure*

■ The CPRA "was enacted for the purpose of increasing freedom of information by giving members of the public access to information in the

---

[6] Further unspecified statutory citations are to the Government Code.

possession of public agencies." (*Filarsky v. Superior Court, supra*, 28 Cal.4th at pp. 425–426.) Legislative policy favors disclosure. (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1408 [44 Cal.Rptr.3d 128] (*San Lorenzo*).) "All public records are subject to disclosure unless the Public Records Act expressly provides otherwise." (*BRV, Inc. v. Superior Court* (2006) 143 Cal.App.4th 742, 751 [49 Cal.Rptr.3d 519].)

California voters endorsed that policy in 2004 by approving Proposition 59, which amended the state Constitution to explicitly recognize the "right of access to information concerning the conduct of the people's business" and to provide that "the writings of public officials and agencies shall be open to public scrutiny." (Cal. Const., art. I, § 3, subd. (b)(1); see *BRV, Inc. v. Superior Court, supra*, 143 Cal.App.4th at p. 750; *Los Angeles Unified School Dist. v. Superior Court, supra*, 151 Cal.App.4th at p. 765.)

### 2. *Exemptions*

■ "The right of access to public records under the CPRA is not absolute." (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1282 [48 Cal.Rptr.3d 183, 141 P.3d 288].) The CPRA "states a number of exemptions that permit government agencies to refuse to disclose certain public records." (*Copley Press*, at p. 1282.) To a large extent, these exemptions reflect legislative concern for privacy interests. (*Ibid.*; *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 289 [64 Cal.Rptr.3d 661, 165 P.3d 462].) The CPRA features two categories of exemptions: "(1) materials expressly exempt from disclosure pursuant to section 6254; and (2) the 'catchall exception' of section 6255 . . . ." (*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1017 [88 Cal.Rptr.2d 552], fn. omitted; see *San Lorenzo, supra*, 139 Cal.App.4th at p. 1408.)

### a. *Enumerated Exemptions*

■ "The Legislature has assembled a diverse collection of exemptions from disclosure in section 6254." (*Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1068 [112 Cal.Rptr.2d 80, 31 P.3d 760]; see also §§ 6254.1–6254.29.) For example, public records need not be disclosed if their disclosure "is exempted or prohibited pursuant to federal or state law . . . ." (§ 6254, subd. (k); cf. *Rim of the World Unified School Dist. v. Superior Court* (2002) 104 Cal.App.4th 1393, 1397 [129 Cal.Rptr.2d 11].) But "this exemption 'is not an independent exemption. It merely incorporates other prohibitions established by law.' " (*Copley Press, Inc. v. Superior Court, supra*, 39 Cal.4th at p. 1283.) Also listed among the express exemptions is: "Critical infrastructure information, as defined in Section 131(3) of Title 6 of the United States

Code, that is voluntarily submitted to the California Emergency Management Agency for use by that office . . . ." (§ 6254, subd. (ab).)

### b. *Catchall Provision*

■ Section 6255 " 'allows a government agency to withhold records if it can demonstrate that, on the facts of a particular case, the public interest served by withholding the records clearly outweighs the public interest served by disclosure.' " (*San Lorenzo, supra,* 139 Cal.App.4th at p. 1408.) This catchall exemption "contemplates a case-by-case balancing process, with the burden of proof on the proponent of nondisclosure to demonstrate a clear overbalance on the side of confidentiality." (*Michaelis, Montanari & Johnson v. Superior Court* (2006) 38 Cal.4th 1065, 1071 [44 Cal.Rptr.3d 663, 136 P.3d 194].) "Where the public interest in disclosure of the records is not outweighed by the public interest in nondisclosure, courts will direct the government to disclose the requested information." (*City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1018.)

### c. *Operation*

Since disclosure is favored, all exemptions are narrowly construed. (Cal. Const., art. I, § 3, subd. (b)(2); *Board of Trustees of California State University v. Superior Court* (2005) 132 Cal.App.4th 889, 896 [34 Cal.Rptr.3d 82].) The agency opposing disclosure bears the burden of proving that an exemption applies. (*Board of Trustees of California State University v. Superior Court,* at p. 896.)

Moreover, if only part of a record is exempt, the agency is required to produce the remainder, if segregable. (§ 6253, subd. (a).) In other words, "the fact that a public record may contain some confidential information does not justify withholding the entire document." (*State Bd. of Equalization v. Superior Court, supra,* 10 Cal.App.4th at p. 1187; see *Connell v. Superior Court* (1997) 56 Cal.App.4th 601, 614 [65 Cal.Rptr.2d 738] [the superior court's "limited disclosure order eliminated the Controller's legitimate security concern" (italics omitted)].) "The burden of segregating exempt from nonexempt materials, however, remains one of the considerations which the court can take into account in determining whether the public interest favors disclosure under section 6255." (*American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 453, fn. 13 [186 Cal.Rptr. 235, 651 P.2d 822].)

Exemptions can be waived. (§ 6254.5; *County of Los Angeles v. Superior Court* (2005) 130 Cal.App.4th 1099, 1107 [30 Cal.Rptr.3d 708].) "Disclosure to one member of the public would constitute a waiver of the exemption

[citation], requiring disclosure to any other person who requests a copy." (86 Ops.Cal.Atty.Gen. 132, 137 (2003), citing § 6254.5; see *City of San Jose v. Superior Court, supra*, 74 Cal.App.4th at p. 1018.)

## B. *The Parties' Contentions*

At issue here is whether the GIS basemap is exempt from disclosure under the CPRA. As stated in the trial court's decision: "Given County's admission that the GIS basemap and data elements are a public record, both parties agree that the resolution of this dispute turns on whether the public record is exempt."

In this court, the County proffers only one exemption, the catchall provision of section 6255.[7] That provision reads in pertinent part: "The agency shall justify withholding any record by demonstrating that the record in question is exempt under express provisions of this chapter or that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." (§ 6255, subd. (a).) When this exemption is invoked, the court undertakes a balancing process. (*Michaelis, Montanari & Johnson v. Superior Court, supra*, 38 Cal.4th at p. 1071.) The court assesses whether " 'on the facts of [the] particular case, the public interest served by withholding the records clearly outweighs the public interest served by disclosure.' " (*San Lorenzo, supra*, 139 Cal.App.4th at p. 1408.)

---

[7] In the trial court, the County urged other exemptions, including section 6254, subdivision (ab), which exempts "Critical infrastructure information, as defined in Section 131(3) of Title 6 of the United States Code, that is voluntarily submitted to the California Emergency Management Agency for use by that office, including the identity of the person who or entity that voluntarily submitted the information." As stated in papers that the County filed in January 2007, it was then "in the process of submitting the GIS Basemap as 'Critical Infrastructure Information' to the California Office of Homeland Security" pursuant to section 6254, subdivision (ab). In a similar vein, the County also relied below on section 6254, subdivision (k), which incorporates other exemptions "pursuant to federal or state law," together with the federal regulations governing CII. The County proffered several other statutory exemptions as well. The trial court rejected all of the County's statutory exemption arguments. With the exception of the catchall exemption of section 6255, the County does not renew any of those arguments here.

In this court, by contrast, the County's amici curiae urge an additional exemption, based on section 6254.9, which the County argued unsuccessfully below. Under that section, computer software—defined to include computer mapping systems—is not treated as a public record. (§ 6254.9, subds. (a), (b).)

Since the point is raised only by amici curiae, we need not and do not consider it. "Amici curiae must take the case as they find it. Interjecting new issues at this point is inappropriate." (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1275 [36 Cal.Rptr.2d 404]; see also, e.g., *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1047, fn. 12 [56 Cal.Rptr.3d 814, 155 P.3d 226].) We therefore decline to address the exemption issue raised solely by the County's amici curiae here.

Addressing the disclosure prong of the balancing test, the County asserts that the public interest in obtaining the GIS basemap is both minimal and hypothetical. Concerning the nondisclosure prong, the County asserts two reasons for withholding the record: one related to straitened public finances and the other arising from security concerns. Weighing the two prongs, the County says, "the balance clearly favors the County's position of nondisclosure because concerns over security and the risk of undermining the County's ability to continue providing valuable services to County residents clearly outweighed CFAC's hypothetical interest."

CFAC disagrees, with particular emphasis on countering the County's security argument.

## C. *Analysis*

In analyzing the availability of this exemption, we accept the trial court's express and implied factual determinations if supported by the record, but we undertake the weighing process anew. (*Connell v. Superior Court, supra*, 56 Cal.App.4th at p. 612.) As our high court has explained, "although a reviewing court should weigh the competing public interest factors de novo, it should accept as true the trial court's findings of the 'facts of the particular case' [citation], assuming those findings are supported by substantial evidence." (*Michaelis, Montanari & Johnson v. Superior Court, supra*, 38 Cal.4th at p. 1072.)

In this case, the trial court considered the evidence, made factual findings, and engaged in the weighing process before concluding that the balance of interests favored disclosure. Though it described both parties' "competing interests" as "somewhat hypothetical," the court nevertheless concluded that the County had "not shown a 'clear overbalance' in favor of non-disclosure."

On independent review of the competing interests, we agree with the trial court's conclusion. In our view, the County has both understated the public interest in disclosure and overstated the public interest in nondisclosure.

### 1. *Public Interest in Permitting Disclosure*

According to the County, "CFAC's interest in disclosure of the GIS Basemap is hypothetical," and it is also "minimal" since acquiring the information "can be accomplished by lesser means." We disagree.

#### a. *The public interest in disclosure is not hypothetical.*

In pressing its characterization of CFAC's interest as hypothetical, the County cites the trial court's concerns about CFAC's standing, since it

"represents no citizen." The County paraphrases the trial court's observation: "Other than a generalized proclamation of the 'public's right to know,' CFAC[] has *no* interest in the GIS Basemap."

■ In making that argument, the County misapprehends the focus of the inquiry. As CFAC points out, the motive of the particular requester is irrelevant; the question instead is whether disclosure serves the *public* interest. "The Public Records Act does not differentiate among those who seek access to public information." (*State Bd. of Equalization v. Superior Court, supra*, 10 Cal.App.4th at p. 1190; see also, e.g., *American Civil Liberties Union Foundation v. Deukmejian, supra*, 32 Cal.3d at p. 451; *Connell v. Superior Court, supra*, 56 Cal.App.4th at pp. 611–612; § 6257.5.)

" 'If the records sought pertain to the conduct of the people's business there *is* a public interest in disclosure. The *weight* of that interest is proportionate to the gravity of governmental tasks sought to be illuminated and the directness with which the disclosure will serve to illuminate.' " (*Connell v. Superior Court, supra*, 56 Cal.App.4th at p. 616.) "The existence and weight of this public interest are conclusions derived from the nature of the information." (*Ibid.*) As this court put it, the issue is "whether disclosure would contribute significantly to public understanding of government activities." (*City of San Jose v. Superior Court, supra*, 74 Cal.App.4th at p. 1018.)

Here, the trial court summarized some of CFAC's proffered "examples as to how access to the GIS basemap will contribute to its understanding of government activities" including "comparison of property tax assessments, issuance of permits, treatment of tax delinquent properties, equitable deployment of public services, issuance of zoning variances." As these examples show, the public's interest in disclosure is very real, given " 'the gravity of the governmental tasks sought to be illuminated and the directness with which the disclosure will serve to illuminate.' " (*Connell v. Superior Court, supra*, 56 Cal.App.4th at p. 616.)

> b. *The public interest in disclosure is not minimal.*

In support of its second point, the County cites a decision of this court for the principle that "public interest in disclosure is minimal . . . where the requester has alternative, less intrusive means of obtaining the information sought." (*City of San Jose v. Superior Court, supra*, 74 Cal.App.4th at p. 1020.) The trial court explicitly recognized that principle, saying "the availability of alternate sources of obtaining the information is relevant in weighing the public interest in disclosure." The court also stated that "CFAC

could obtain the same information found in the GIS basemap by performing a (more laborious) search of other publicly available records."[8]

The County misplaces its reliance on our decision in *City of San Jose v. Superior Court, supra,* 74 Cal.App.4th 1008. That case is factually distinguishable, since it involved privacy concerns that are not in play here. In *City of San Jose,* we determined that "airport noise complainants have a significant privacy interest in their names, addresses, and telephone numbers as well as in the fact that they have made a complaint to their government, and that disclosure of this information would have a chilling effect on future complaints." (*Id.* at pp. 1023–1024.) Concerning the CPRA catchall exemption, we explained: "In determining whether the public interest in nondisclosure of individuals' names and addresses outweighs the public interest in disclosure of that information," courts evaluate whether disclosure serves "the legislative purpose" of illuminating the performance of public duties. (74 Cal.App.4th at p. 1019.) "Where disclosure of names and addresses would not serve this purpose, denial of the request for disclosure has been upheld." (*Ibid.*) "Courts have also recognized that the public interest in disclosure is minimal, even when the requester asserts that personal contact is necessary to confirm government compliance with mandatory duties, where the requester has alternative, less intrusive means of obtaining the information sought." (*Id.* at p. 1020.) Conversely, "where the disclosure of names and addresses is necessary to allow the public to determine whether public officials have properly exercised their duties by refraining from the arbitrary exercise of official power, disclosure has been upheld." (*Ibid.*)

While the availability of less intrusive means to obtain the information may be a factor in the analysis, particularly in privacy cases, the existence of alternatives does not wholly undermine the public interest in disclosure. (Cf. *City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1025.) Even where a requester "has an alternative means to access the information, that should not prohibit it from obtaining the documents under the CPRA." (*Los Angeles Unified School Dist. v. Superior Court, supra,* 151 Cal.App.4th at p. 772, fn. 6.) The records at issue here " 'pertain to the conduct of the people's business' " so " 'there *is* a public interest in disclosure.' " (*Connell v. Superior Court, supra,* 56 Cal.App.4th at p. 616.) For the reasons proffered by CFAC and summarized by the trial court, it also appears that "disclosure would contribute significantly to public understanding of government activities." (*City of San Jose v. Superior Court,* at p. 1018.)

In sum, we conclude, the public interest in disclosure of the GIS basemap is neither hypothetical nor minimal. That brings us to the second prong of the balancing test, assessing the public interest in nondisclosure.

---

[8] CFAC contends that the trial court was mistaken factually as to this point.

## 2. Public Interest in Preventing Disclosure

The County proffers two interests to support nondisclosure. First, the County cites financial issues, positing its "continuing effort to provide the public with a high level of service during challenging economic times" and emphasizing the threatened impact on first responders. Second, the County raises public safety concerns, stressing the need "to protect sensitive infrastructure information not customarily in the public domain." We consider and reject each in turn.

### a. The County's financial interests do not compel nondisclosure.

According to the County, it developed the GIS basemap "at a significant cost in terms of time, effort and resources." If "forced to provide the GIS Basemap to all requesters at the direct cost of production," the County contends, it will lose its ability to sell the technology, with the result that "the County alone will have to shoulder the obligation of maintaining the GIS Basemap—a difficult task during times of ever increasing budget deficits. The end result will be a reduction in service levels to the public." The County also asserts that losing "control over its intellectual property (copyright interests in the GIS Basemap) with the dissemination of electronic copies . . . will negatively impact the tools used by first responders" in the county. It argues: "This is no hypothetical scenario, but is based upon actual experiences of other counties."

In support of this claim in the trial court, the County submitted a declaration stating that San Diego and Ventura counties "saw their programs wither away once outside funding disappeared (due to providing the GIS maps at little or no cost to the public)."

CFAC countered below with a declaration that "San Diego County's GIS basemap program . . . is alive and thriving" and "Ventura County's GIS operation is robust and growing." That declaration also averred that "fourteen counties in California . . . provide their GIS basemap data in electronic format to the public free of charge" while another "twenty-three counties in California . . . provide their GIS basemap data in electronic format to the public for the cost of reproduction."

Addressing the financial issues, the trial court expressed concern "that County will have difficulty recouping the expense incurred in creating the GIS basemap," but it noted the "dearth of evidence that this was County's initial plan." Additionally, as just noted, CFAC offered evidence that other counties disclosing their GIS basemap programs had suffered few ill fiscal effects. The trial court apparently credited this evidence. Applying the

deferential substantial evidence review standard, we do so as well. (*Connell v. Superior Court, supra,* 56 Cal.App.4th at p. 613.)

Beyond the state of the evidence in this particular record, there are other reasons to accord little weight to the financial concerns. As has been said: "There is nothing in the Public Records Act to suggest that a records request must impose *no* burden on the government agency." (*State Bd. of Equalization v. Superior Court, supra,* 10 Cal.App.4th at p. 1190, fn. 14; see also *Connell v. Superior Court, supra,* 56 Cal.App.4th at p. 614.) Thus, for example, the $43,000 cost of compiling an accurate list of names was not "a valid reason to proscribe disclosure of the identity of such individuals." (*CBS Broadcasting Inc. v. Superior Court* (2001) 91 Cal.App.4th 892, 909 [110 Cal.Rptr.2d 889]; cf. *American Civil Liberties Union Foundation v. Deukmejian, supra,* 32 Cal.3d at pp. 452–453 [courts should not "ignore any expense and inconvenience involved in segregating nonexempt from exempt information"].)

b. *The proffered security concerns do not compel nondisclosure.*

The County also asserts a public safety interest in guarding against terrorist threats, based on its contention that the GIS basemap contains sensitive information that is not publicly available, such as the exact location of Hetch Hetchy reservoir components. The County cites the precision of its "georeferenced parcel map" (described as accurate "within +/- 1 foot in the developed areas and +/- 5 feet in the hilly areas") in arguing that disclosure of the basemap would "allow anyone to locate the parcels overlaying the Hetch Hetchy water lines. Matching the GIS Basemap with orthophotographs, which are in the public domain, would allow anyone to pinpoint weak spots in the system and quickly and effectively plan a terrorist attack." By contrast, the County maintains, other publicly available maps "are not georeferenced, do not contain GPS coordinates, do not include orthophotographs, and are not a continuous representation of the Hetch Hetchy water supply system—key elements to disclosing precise locations of the critical infrastructure."

To prove this claim in the trial court, the County submitted the declaration of Robert Colley, acting GIS manager for its Information Services Department, which includes these statements: "Requiring the County to provide the GIS Basemap in electronic format to the public will jeopardize public safety because it will provide the public with access to sensitive information that is not otherwise publicly available." "For public safety reasons, it is critical that geospatial information such as the GIS Basemap stay out of the public domain." "The actual location of the Hetch Hetchy water lines are generally known, but not provided in any detail for obvious reasons—to minimize the threat of terrorist attack on the water system." "The

exact location of Hetch Hetchy water lines is an integral part of the GIS Basemap and not easily segregable."

To refute that claim, CFAC offered the declaration of Bruce Joffe, a member of the Geospatial Working Group, which "is organized by the U.S. Department of Homeland Security" and "is comprised of GIS professionals from various federal agencies . . . and the private sector" who "discuss issues of GIS technology and national security." Joffe declared: "Based on my knowledge, skill, experience, training and education in the areas of GIS, the lines identified by the County in each of the documents as Hetch Hetchy 'water pipelines' are actually not the pipelines themselves, but the land easement areas or rights-of-way. The easements cover an area greater than the pipelines themselves, and do not indicate the specific location of pipes, which are buried underground." "The location of the Hetch Hetchy easements can be obtained from other sources. . . ." Joffe opined "that the location of the Hetch Hetchy easement[s] is not the kind of information that would uniquely aid terrorists. . . . Restricting public access to the County's GIS basemap data is unlikely to be a major impediment for terrorists in identifying and locating their desired targets." Joffe also addressed segregability, declaring: "The County could easily disclose the data elements and descriptive attribute data requested by CFAC in its June 12, 2006 Public Record Act request without also disclosing the location of the Hetch Hetchy easements, if it chose to do so." He then described how that could be done.

Addressing these issues, the trial court explained that not everything in the GIS basemap has security implications. As the County conceded and the trial court found, "some of the information in the GIS basemap" is a matter of public record that has "nothing to do with critical infrastructure." By way of example, the court cited "the assessed value of a single family home in San Jose" and questioned why it should be "cloaked with the protection of CII/PCII simply by submission to OHS" (California's Office of Homeland Security). The court continued: "It appears County has belatedly focused on to the information pertaining to 'water lines' and used that as its primary, if not sole, basis for obtaining the CII/PCII designation without any concession that the GIS basemap consists of any other publicly available information." The court concluded: "County has not made the initial effort to establish that all information contained in the GIS basemap is CII. Having failed to meet its initial burden, County's assertion of this particular exemption fails." The record supports these findings. (Cf., e.g., *Williams v. Superior Court* (1993) 5 Cal.4th 337, 355 [19 Cal.Rptr.2d 882, 852 P.2d 377] [a public agency may not "shield a record from public disclosure, regardless of its nature, simply by placing it in a file label[]ed 'investigatory' "].)

Furthermore, the trial court observed, "it does not appear this has been an overriding concern to County, as shown by the dissemination of the GIS

basemap to others, albeit relying on a form of non-disclosure agreement." As noted above, the County sold the GIS basemap to 18 purchasers, including three private entities. In the trial court's view: "If the security issue were of greater importance, one would think there would be no dissemination of the GIS basemap whatever." We see no reasoned basis for overturning that inference. (Cf. § 6254.5, subd. (e) [no waiver of exemption where disclosure is made to *government* agency that "agrees to treat the disclosed material as confidential"]; *County of Los Angeles v. Superior Court, supra,* 130 Cal.App.4th 1099, 1107 [this section "provides a means for governmental agencies to share privileged materials without waiving the privilege"].)

■ Security may be a valid factor supporting nondisclosure. (See, e.g., *Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1346 [283 Cal.Rptr. 893, 813 P.2d 240] [Governor's private appointment schedule]; *Procunier v. Superior Court* (1973) 35 Cal.App.3d 211, 212 [110 Cal.Rptr. 531] [diagrams depicting correctional facility], disapproved on other grounds in *Shepherd v. Superior Court* (1976) 17 Cal.3d 107, 124 [130 Cal.Rptr. 257, 550 P.2d 161]; 73 Ops.Cal.Atty.Gen. 236, 237–239 (1990) [same].) But the "mere assertion of possible endangerment does not 'clearly outweigh' the public interest in access to these public records." (*CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 652 [230 Cal.Rptr. 362, 725 P.2d 470]; accord, *Commission on Peace Officer Standards & Training v. Superior Court, supra,* 42 Cal.4th at p. 302.) While we are sensitive to the County's security concerns, we agree with the trial court that the County failed to support nondisclosure on this ground.

### 3. *Weighing the Competing Interests*

The balancing test is applied on a case-by-case basis. (*Michaelis, Montanari & Johnson v. Superior Court, supra,* 38 Cal.4th at p. 1071; *CBS Broadcasting Inc. v. Superior Court, supra,* 91 Cal.App.4th at p. 908.) As the party seeking to withhold the record, the County bears the burden of justifying nondisclosure. (*Board of Trustees of California State University v. Superior Court, supra,* 132 Cal.App.4th at p. 896; *Los Angeles Unified School Dist. v. Superior Court, supra,* 151 Cal.App.4th at p. 767.)

Independently weighing the competing interests in light of the trial court's factual findings, we conclude that the public interest in disclosure outweighs the public interest in nondisclosure. We thus agree with the trial court that the County failed to "demonstrate a clear overbalance on the side of confidentiality." (*Michaelis, Montanari & Johnson v. Superior Court, supra,* 38 Cal.4th at p. 1071.)

### III. Limitations on Disclosure

Having concluded that neither federal nor state law provides a basis for withholding the GIS basemap, we turn to the County's arguments for limitations on disclosure. As previously noted, the County argues for the right (A) to demand end user agreements, because the GIS basemap is copyrightable, and (B) to recover more than its direct costs of production, based on section 6253.9, subdivision (b), of the CPRA.

### A. Copyright Protection

#### 1. Background

In arguments below, the County raised similar copyright arguments, relying on section 6254.9. Section 6254.9 permits the nondisclosure of computer software, defined to include computer mapping systems. (§ 6254.9, subds. (a), (b).) This statutory exemption is based on a legislative determination that software is not a public record. (*Id.*, subd. (a).) Nevertheless, as subdivision (d) explains: "Nothing in this section is intended to affect the public record status of information merely because it is stored in a computer. Public records stored in a computer shall be disclosed as required by this chapter." (*Id.*, subd. (d).) Subdivision (e) addresses copyright as follows: "Nothing in this section is intended to limit any copyright protections." (*Id.*, subd. (e).) Relying on that last subdivision, the County argued that it could "require end users to execute an agreement not to violate [its] copyright interest in the GIS Basemap."

CFAC disagreed. It asserted: "No reported California decision has ever concluded that a public agency may refuse to release copies of public records to protect its own purported copyright."

The trial court agreed with CFAC. The court briefly explained its reasoning in footnote 19 of its May 2007 order. The court first quoted section 6254.9, subdivision (e), then stated: "CFAC is correct in its interpretation that, when read in conjunction with subdivision (d), copyright protection is not appropriate here."

#### 2. The Parties' Contentions

In this court, the County raises both procedural and substantive arguments concerning copyright.

Procedurally, the County complains that the trial court did not reach its copyright claim. The County acknowledges the court's holding in footnote 19

of the court's May 2007 order. But it maintains that the court made its ruling in the context of deciding that the GIS basemap is not "computer software" and thus does not qualify for exemption under section 6254.9, subdivision (a). In the County's view, "the trial court should not have summarily dismissed the County's request for an end user agreement, without first examining the creativity and compilation issues." (See 17 U.S.C. § 101 [defining compilation]; *Feist Publications, Inc. v. Rural Tel. Service Co.* (1991) 499 U.S. 340, 345 [113 L.Ed.2d 358, 111 S.Ct. 1282] [recognizing a low threshold of creativity for copyright protection].)

In its substantive arguments, the County maintains that copyright law protects its compilation of data as a "unique arrangement." The County seeks the right to demand an end user agreement upon disclosure of the GIS basemap, to protect its rights as the "rightful owner" of copyrightable intellectual property in the map.

CFAC disputes both the procedural and substantive arguments interposed by the County. Countering the County's procedural claim, CFAC points to footnote 19 of the trial court's order, characterizing it as an explicit rejection of the County's copyright arguments. Substantively, CFAC argues, the CPRA does not recognize copyright interests in public records such as these, and it thus precludes the imposition of an end user agreement upon their release.

### 3. *Analysis*

At the outset, we reject the County's procedural claim that the trial court should have examined "the creativity and compilation issues" involved in its copyright claim. For one thing, the County did not brief those specific issues in its papers below. It simply made the bald assertion that it owns a "copyright interest in the GIS Basemap" followed by a citation to the federal copyright statute. (17 U.S.C. § 101 et seq.) And that assertion was addressed and rejected by the trial court, as shown by its citation to authority. In any event, the County preserved its substantive copyright claim, which we now review.

#### a. *State Law Question*

State law "determines whether [a public official] may claim a copyright in his office's creations." (*Microdecisions, Inc. v. Skinner* (Fla.Dist.Ct.App. 2004) 889 So.2d 871, 875; see *County of Suffolk v. First American Real Estate* (2d Cir. 2001) 261 F.3d 179, 188; *Bldg. Officials & Code Adm. v. Code Tech, Inc.* (1980) 628 F.2d 730, 735–736.) "Each state may determine whether the works of its government entities may be copyrighted." (*Microdecisions, Inc. v. Skinner*, at p. 876.)

In some states, statutes explicitly recognize the authority of public officials or agencies to copyright specific public records that they have created. (See *Microdecisions, Inc. v. Skinner, supra,* 889 So.2d at pp. 874, 875 [Florida state law authorized "certain agencies to obtain copyrights" and "permitted certain categories of public records to be copyrighted," but it gave county property appraisers "no authority to assert copyright protection in the GIS maps, which are public records"]; cf. *County of Suffolk v. First American Real Estate, supra,* 261 F.3d at p. 189 [New York's public record law "did not specifically address the impact on a state agency's copyright"].)

At issue here is how California's public records law treats the County's copyright claim. That is a question of first impression in this state. Because it requires statutory interpretation of the CPRA, it is also a question of law, which we review de novo. (*Los Angeles Unified School Dist. v. Superior Court, supra,* 151 Cal.App.4th at p. 767.) We begin our analysis with the specific provision cited by the County in support of its copyright interest.

 b. *Section 6254.9*

The CPRA references copyright protection in a single provision, section 6254.9, subdivision (e). As previously noted, that provision states: "Nothing in this section is intended to limit any copyright protections." (§ 6254.9, subd. (e).)

As the County reads that statutory language, it "expressly provides for copyright protection despite production of public records." Furthermore, the County says, copyright protection "is not limited to computer software," which has its own discrete exemption in section 6254.9, subdivision (a).[9]

 We reject the County's interpretation. At the outset, we reiterate the principle that restrictions on disclosure are narrowly construed. (Cal. Const., art. I, § 3, subd. (b)(1), (2); *Board of Trustees of California State University v. Superior Court, supra,* 132 Cal.App.4th at p. 896.) With that principle in mind, we consider the County's contentions, applying settled rules of statutory construction. As the California Supreme Court recently reaffirmed, "our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute." (*Smith v. Superior Court, supra,* 39 Cal.4th at p. 83.)

---

[9] Section 6254.9, subdivision (a) provides: "Computer software developed by a state or local agency is not itself a public record under this chapter." The County conceded below that the GIS basemap is a public record. The contrary arguments of its amici curiae notwithstanding, that concession appears well founded. (Cf. 88 Ops.Cal.Atty.Gen. 153, 157 (2005) ["parcel boundary map data maintained by a county assessor in an electronic format is subject to public inspection and copying . . ." under CPRA].) Since the GIS basemap is a public record, the County cannot claim the computer software exemption of section 6254.9, subdivision (a). Nor does it attempt to do so here. (See fn. 7, *ante.*)

(i) *Statutory Language*

In undertaking our analysis, we start with the language of the provision. (*Smith v. Superior Court, supra*, 39 Cal.4th at p. 83; *Los Angeles Unified School Dist. v. Superior Court, supra*, 151 Cal.App.4th at p. 767.) We again quote that language, emphasizing two words that guide our construction: "Nothing in this *section* is intended to *limit* any copyright protections." (§ 6254.9, subd. (e), italics added.)

First, the provision uses the word "section." (§ 6254.9, subd. (e).) It does not employ the broader term "chapter," which would encompass the entire CPRA. That word choice directs our focus to the subject of section 6254.9, which is computer software. Given this context, use of the word "section" strongly suggests that the referenced copyright protection is limited to computer software.

Second, the provision states that it does not "limit" copyright protection. (§ 6254.9, subd. (e).) In our view, that phrasing operates only as a legislative *recognition* that copyright protection for software is available in a proper case; it cannot be read as an affirmative *grant of authority* to obtain and hold copyrights. The Legislature knows how to explicitly authorize public bodies to secure copyrights when it means to do so. For example, the Education Code includes a number of provisions authorizing copyrights, including this one: "Any county board of education may secure copyrights, in the name of the board, to all copyrightable works developed by the board, and royalties or revenue from such copyrights are to be for the benefit of the board securing such copyrights." (Ed. Code, § 1044; see also, e.g., *id.*, §§ 32360, 35170, 72207, 81459.) The Health and Safety Code contains this provision, which references the statute at issue here: "Copyright protection and all other rights and privileges provided pursuant to Title 17 of the United States Code are available to the [Department of Toxic Substances Control] to the fullest extent authorized by law, and the department may sell, lease, or license for commercial or noncommercial use any work, including, but not limited to, videotapes, audiotapes, books, pamphlets, and computer software as that term is defined in Section 6254.9 of the Government Code, that the department produces whether the department is entitled to that copyright protection or not." (Health & Saf. Code, § 25201.11, subd. (a); see also, e.g., *id.*, § 13159.8, subd. (c).) Here, by contrast, section 6254.9 contains no such express authorization to secure copyrights.

(ii) *Legislative History*

■■ "If the statutory terms are ambiguous, we may examine extrinsic sources, including . . . the legislative history." (*Smith v. Superior Court, supra*,

39 Cal.4th at p. 83; accord, *Los Angeles Unified School Dist. v. Superior Court, supra*, 151 Cal.App.4th at pp. 767–768.)

On the other hand, where "legislative intent is expressed in unambiguous terms, we must treat the statutory language as conclusive; 'no resort to extrinsic aids is necessary or proper.' " (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 61 [124 Cal.Rptr.2d 507, 52 P.3d 685]; see also, e.g., *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc., supra*, 133 Cal.App.4th at pp. 29–30.) That is the situation here. By the express terms of section 6254.9, the Legislature has demonstrated its intent to acknowledge copyright protection for software only.

In sum, while section 6254.9 recognizes the availability of copyright protection for software in a proper case, it provides no statutory authority for asserting any other copyright interest.

### c. *End User Restrictions*

Having found no specific statutory copyright authorization, we now consider whether the County may demand licensing agreements or otherwise impose restrictions on end users.

While no California court has addressed this question, courts in two other jurisdictions have, reaching opposite conclusions. Applying New York law, the court in *County of Suffolk* found end user agreements permissible. (*County of Suffolk v. First American Real Estate, supra*, 261 F.3d at pp. 191–192.) There, the court construed the "plain language" of New York's public records law "to permit [the] County to maintain its copyright protections while complying with its obligations" under the statute. (*Id.* at p. 191.) Three years later, applying Florida law, the court in *Microdecisions* rendered a contrary decision. (*Microdecisions, Inc. v. Skinner, supra*, 889 So.2d at p. 872.) There, the court decided that a county property appraiser could not "require prospective commercial users of the records created in his office to first enter into a licensing agreement." (*Ibid.*)

■ As a matter of first impression in California, we conclude that end user restrictions are incompatible with the purposes and operation of the CPRA. In arriving at that conclusion, we find ourselves in agreement with the Florida decision in *Microdecisions, Inc. v. Skinner, supra*, 889 So.2d 871. That case addressed similar statutory provisions, and its reasoning is persuasive. (*Id.* at pp. 875–876.) By contrast, we find the *County of Suffolk* case less consistent with our state's law. (See *County of Suffolk v. First American Real Estate, supra*, 261 F.3d at pp. 191–192.)

As the discussion in *Microdecisions* reflects, Florida's public records law is similar to California's in at least two important respects. (*Microdecisions,*

*Inc. v. Skinner, supra*, 889 So.2d at p. 875.) For one thing, under Florida law: "A requester's motive for seeking a copy of documents is irrelevant." (*Ibid.*) The same is true in California. By express legislative mandate, the CPRA "does not allow limitations on access to a public record based upon the purpose for which the record is being requested, if the record is otherwise subject to disclosure." (§ 6257.5; see *City of San Jose v. Superior Court, supra*, 74 Cal.App.4th at p. 1018.) In addition, California shares a second key similarity with Florida law: both states limit the fees that may be charged for producing a public record. In Florida, "the fee prescribed by law" is "generally the cost of reproduction." (*Microdecisions, Inc. v. Skinner*, at p. 875.) California law incorporates the same general limitation. (§ 6253, subd. (b).)

Beyond these factual similarities, we find the Florida court's reasoning persuasive. The *Microdecisions* court discussed "the interplay between the federal copyright act and Florida's public records laws." (*Microdecisions, Inc. v. Skinner, supra*, 889 So.2d at p. 876.) It explained: "The copyright act gives the holder the exclusive rights to reproduce and distribute a work and to authorize others to do so." (*Ibid.*, citing 17 U.S.C. § 106(1), (3).) "As such, a copyright owner may refuse to provide copies of the work or may charge whatever fee he wants for copies of the work or a license to use the work." (889 So.2d at p. 876.) "The Florida public records law, on the other hand, requires State and local agencies to make their records available to the public for the cost of reproduction." (*Ibid.*, citing Fla. Stat., § 119.07(1)(a).) "This mandate overrides a governmental agency's ability to claim a copyright in its work unless the legislature has expressly authorized a public records exemption." (*Microdecisions, Inc. v. Skinner*, at p. 876.)

The same persuasive reasoning applies to the interplay between copyright law and California's public records law, with the result that unrestricted disclosure is required. Doing so serves effectuates the purpose of the statute, which is "increasing freedom of information by giving members of the public access to information in the possession of public agencies." (*Filarsky v. Superior Court, supra*, 28 Cal.4th at pp. 425–426.) This same "policy is enshrined in the Constitution." (*Los Angeles Unified School Dist. v. Superior Court, supra*, 151 Cal.App.4th at p. 776, citing Cal. Const., art. I, § 3, subd. (b).) That policy would be undercut by permitting the County to place extra-statutory restrictions on the records that it must produce, through the use of end user agreements.

### d. *Conclusion*

The CPRA contains no provisions either for copyrighting the GIS basemap or for conditioning its release on an end user or licensing agreement by the

requester. The record thus must be disclosed as provided in the CPRA, without any such conditions or limitations.

## B. *Recovery of Additional Costs*

In its final argument in this court, the County seeks the right to charge additional amounts for producing the GIS basemap, beyond its direct cost, pursuant to section 6253.9, subdivision (b).

### 1. *Overview*

Generally speaking, an agency may recover only the direct cost of duplicating a record. (§ 6253, subd. (b).) The agency "shall make the records promptly available to any person upon payment of fees covering direct costs of duplication, or a statutory fee if applicable." (*Ibid.*) For paper records, direct cost has been interpreted to cover the "cost of running the copy machine, and conceivably also the expense of the person operating it" while excluding any charge for "the ancillary tasks necessarily associated with the retrieval, inspection and handling of the file from which the copy is extracted." (*North County Parents Organization v. Department of Education* (1994) 23 Cal.App.4th 144, 148 [28 Cal.Rptr.2d 359]; cf. *id.* at p. 149 (dis. opn. of Huffman, J.); see also *Los Angeles Unified School Dist. v. Superior Court, supra,* 151 Cal.App.4th at p. 770; 88 Ops.Cal.Atty.Gen., *supra,* at p. 164.)

For electronic records, however, the statute allows an agency to recover specified ancillary costs in either of two cases: (1) when it must "produce a copy of an electronic record" between "regularly scheduled intervals" of production, or (2) when compliance with the request for an electronic record "would require data compilation, extraction, or programming to produce the record." (§ 6253.9, subd. (b)(1), (2); see 88 Ops.Cal.Atty.Gen., *supra,* at p. 164.) Under those circumstances, the agency may charge "the cost to construct a record, and the cost of programming and computer services necessary to produce a copy of the record . . . ." (§ 6253.9, subd. (b).)

### 2. *The Parties' Contentions*

Here, the County asserts entitlement to greater costs on both statutory bases. (§ 6253.9, subd. (b)(1), (2).) The County maintains: "It is undisputed that in order to comply with CFAC's request, the County would be required to produce a copy of the electronic GIS Basemap at an unscheduled interval. It is also undisputed that compliance requires data compilation, extraction, or programming to produce the GIS Basemap." According to the County, it raised this issue below, but the trial court failed to address it.

CFAC acknowledges that the County raised the issue below. But in its view, the County failed to advise the trial court of the amount claimed "nor did it indicate how it proposes to calculate that cost, an omission that no doubt led to the respondent court's order to produce the basemap for the direct cost of duplication."

CFAC also questions whether the statute applies, saying "since the County sends copies of the basemap to its paid subscribers on a regular basis, it does not appear that any additional programming would be necessary to fulfill CFAC's request for the data under the PRA." (See § 6253.9, subd. (b)(1).)

The County disputes this last point in its reply.

3. *Analysis*

Given the parties' opposing factual contentions, coupled with the absence of an explicit ruling by the trial court on this point, remand is warranted on the question of costs.

## SUMMARY OF CONCLUSIONS

I. Federal homeland security provisions do not apply here.

As recognized in both the Critical Infrastructure Information Act and the accompanying regulations promulgated by Department of Homeland Security, there is a distinction between submitters of critical infrastructure information (CII) and recipients of protected critical infrastructure information (PCII). The federal prohibition on disclosure of protected confidential infrastructure information applies only to recipients of PCII. Because the County did not receive PCII, the federal provisions do not apply.

II. The proffered California Public Records Act exemption does not apply.

After independently weighing the competing interests in light of the trial court's factual findings, we conclude that the public interest in disclosure outweighs the public interest in nondisclosure.

III. A. There is no statutory basis either for copyrighting the GIS basemap or for conditioning its release on a licensing agreement. B. The matter will be remanded to the trial court to allow it to determine allowable costs that the County may charge for producing the GIS basemap.

## DISPOSITION

Let a peremptory writ of mandate issue commanding respondent court to set aside that portion of its order of May 18, 2007, that directs the County to "[c]harge CFAC the direct cost for the copy provided." In all other respects, the County's request for an extraordinary writ is denied. Respondent is directed to conduct a new hearing to determine allowable costs that the County may charge for producing the requested public record. The stay issued on June 14, 2007, by this court shall remain in effect until this opinion is final. Costs in this original proceeding are awarded to real party in interest, CFAC.

Elia, Acting P. J., and Mihara, J., concurred.

On February 27, 2009, the opinion was modified to read as printed above.