Filed 12/27/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ARTURO CASTAÑARES, | D082048 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. 37-2021-00017713-CU-MC-CTL) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| CITY OF CHULA VISTA, | |
| Real Party in Interest. | |

Original proceeding on a petition for extraordinary relief.  Relief granted in part; denied in part.

Briggs Law Corporation, Cory J. Briggs, and Janna M. Ferraro, for Petitioner.

Aaron Mackey for Electronic Frontier Foundation; David Loy for First Amendment Coalition; and Katie Townsend for Reporters Committee for Freedom of the Press, as Amici Curiae on behalf of Petitioner.

Karen Rogan, Assistant City Attorney; Colantuono, Highsmith & Whatley, Michael G. Colantuono, Carmen A. Brock, and Andrew C. Rawcliffe, for Real Party in Interest.

Jones & Mayer, Scott Wm. Davenport for California Sheriffs' Association, California Police Chiefs Association and California Police Officers' Association as Amici Curiae on behalf of Real Party in Interest.

Bobbitt Pinckard & Fields, Richard L. Pinckard for Peace Officers Research Association of California and Peace Officer Research Association of California Legal Defense Fund as Amici Curiae on behalf of Real Party in Interest.

Gutierrez, Preciado & House for the League of California Cities and the International Municipal Lawyers Association, as Amici Curiae on behalf of Real Party in Interest.

No appearance for Respondent.

In this matter of first impression, we consider a request made by a private citizen under the California Public Records Act (Gov. Code,[1] § 7923.500; CPRA) to obtain video footage recorded by drones operated by the City of Chula Vista's (City) police department. The City operates a pilot program to use drones as first responders for certain 911 calls. Per this program, a police officer determines when sending a drone to examine a situation is an appropriate response to a public call for assistance. If the officer decides that the use of a drone is suitable, a remote pilot flies the drone to the area in question, streaming video to the officers to better inform them how to respond to the situation.

---

[1]     Statutory references are to the Government Code unless otherwise specified.

2

Arturo Castañares, a journalist and private pilot, made a CPRA request for information related to the City's use of drones, including the video footage for all drone flights from March 1 to March 31, 2021.  Ultimately, the City provided Castañares with all the information he requested except for the video footage but not before Castañares filed suit against the City.

The matter proceeded to trial, and, as detailed in its minute order, the superior court determined that the video footage was exempt under section 7923.600, subdivision (a) as records of investigations.  Further, the court found that any benefit of turning over the videos was outweighed by the "unreasonable burden" placed on the City in redacting the videos before they could be provided to Castañares.

Castañares then filed this petition for an extraordinary writ asking us to direct the superior court to vacate its minute order and order the City to disclose the requested video footage that is not related to any law enforcement investigation with appropriate redactions if necessary.  In an informal response, the City requested that this court consider the petition to clarify the scope of its obligation to provide the drone video footage.

We agree with Castañares that the superior court erred in determining, as a matter of law, all video footage from the drone program is exempt under section 7923.600, subdivision (a) as records of investigations.  However, it might be the case, after further inquiry, consistent with this opinion, that the majority of the video footage is exempt.  That said, we cannot make that determination on the record before us.  Similarly, we acknowledge that the catchall provision of the CPRA, codified at section 7922.000, may also support the City's position that the drone video footage does not have to be provided to Castañares, but the record does not allow us to engage in the necessary balancing to determine if that provision applies.  As such, we shall grant the

3

requested relief in part and remand this matter back to the superior court with directions to vacate the subject minute order and conduct further proceedings consistent with this opinion. We decline to order any of the other requested relief in the instant petition.

## FACTUAL AND PROCEDURAL BACKGROUND

The Federal Aviation Authority (FAA) selected the City's police department as the first in the country to test the use of drones as first responders. Previously, police agencies relied on responding officers to launch drones when on scene. The City's innovation was to dispatch drones before officers arrived and, similar to the use of helicopters, provide incident commanders and responding officers livestreamed video of the scene before arrival, so they could respond more effectively and safely.

Before launching its program, the City engaged in extensive outreach to civil rights groups, media, and in other public fora, soliciting input on policies for police use of drones. The City's policy, which prohibits use of drones for general surveillance or patrol, reflects that outreach and the City's extensive planning and research.

Moreover, the City's drone policy adopted many of the American Civil Liberties Union's 2013 recommendations to Congress including:
(1) restricting use of drones to calls for service; (2) privacy controls limiting access to and retention of videos; (3) community engagement and online access to flight path data through a website and links to City's policies and media coverage, as well as offering program tours to civic groups, police agencies, and others; (4) City Council and citizen advisory committee oversight of policy decisions; (5) internal auditing and tracking; and (6) banning weaponization.

4

Additionally, the City provides a substantial amount of information about the drone program on its website. To this end, the public may access anonymized flight data (including date, time, location, flight paths, and call summaries). The City also offers after-action-reports (AARs) wherein the City can respond to questions about drone flights (for example, "Why did a drone fly over my house?").

On April 5, 2021, Castañares emailed a Chula Vista Police lieutenant a CPRA request for "access to and copies of video footage from all CVPD [Chula Vista Police Department] drone flights conducted between March 1 and March 31, 2021, as well as documents related to the retention and custody of such videos, who maintains the physical storage of those videos, who has access to those videos, and documents related to all costs associated with the storage and retention of those videos." However, Castañares qualified his request by asking the City to "redact any such videos that may be part of any ongoing or pending investigations, but provide a log of any videos or documents withheld, who made the determination to withhold them, and when they may be released." In addition, Castañares asked for documents "related to any preplanning, flight plans, mapping, or other information used to organize, operate, and monitor [the drone] flights."

On April 14, a day before the statutory deadline to respond,[2] the City provided "a timely partial response" informing Castañares that responsive information could be found on the City's website[3] and the requested video

---

[2] An agency must respond within 10 days of receiving a request for a copy of records under the CPRA. (§ 7922.535, subd. (a).)

[3] Under section 7922.545, subdivision (a), in response to a request for a public record, a public agency may direct a member of the public to its website.

5

footage was exempt under the investigatory records exemption per section 7923.600, subdivision (a). The City also extended the deadline for its response to Castañares's request until April 26.[4]

Before the April 26 deadline for the City to respond, Castañares filed a lawsuit against the City for declaratory and injunctive relief, requesting a judicial declaration that the City did not comply with the CPRA, a writ of mandate directing the City to comply with the CPRA, and an injunction to require the City to allow Castañares to inspect and obtain copies of all responsive records to his CPRA request. Castañares also sought "[a]ll attorney fees and other legal expenses incurred . . . in connection with th[e] lawsuit."

However, before Castañares filed suit, the chief of police offered to give him a tour of the City's drone program operations. As part of the tour, Castañares would be permitted to "ask direct questions of those responsible for administering the program regarding program data gathering use and storage." Additionally, the City proposed to further discuss with Castañares "a more limited form of disclosure" as well as "other possible program checks and balances that could be developed beyond what is already in place to address Mr. Castañares' concerns." Through his attorney, Castañares stated "the tour and any information that would have been elicited during the tour should be handled through formal discovery."

The City filed an answer to the complaint, and the parties engaged in limited discovery, including the taking of depositions of two of the City's designees as well as written discovery. Also, the City produced additional

---

4      Section 7922.535, subdivision (b) allows an agency to extend the usual 10-day time limit to respond to a CPRA request under certain circumstances.

documents in response to Castañares's CPRA request and requests for production.

In March 2023, the parties submitted their briefs on the merits as well as other supporting documentation and evidence. After reviewing the submitted material, the trial court issued a tentative ruling as well as orders on Castañares's objections to certain evidence proffered by the City.

At trial call on March 30, 2023, the parties confirmed that they wished to present oral argument, and the court calendared a hearing for April 10, 2023.

At the April 10 hearing, Castañares admitted that the only open issue was whether the City had to provide the drone video footage. After the court entertained oral argument, it issued a minute order finding in favor of the City. In doing so, the court acknowledged that there was no California authority addressing the issues before it: "It is undisputed that the CVPD drone program is the first of its kind in California, and consequently it is undisputed that no California court has previously taken up the legal questions raised in this case." Nevertheless, the court concluded, "as a matter of law, that the material requested in petitioner's CPRA request and which has not already been turned over by the City (consisting of footage from all CVPD drone flights conducted between March 1, and March 31, 2021) is categorically exempt under Government Code section 7923.600." In addition, the court determined that the City established that the CPRA request "seeks to impose an unreasonable burden on the City's resources with

7

no substantial countervailing benefit given the wealth of information already turned over by the City to petitioner."[5]

Castañares then filed this petition. Although the City opposes the relief Castañares seeks, it agreed that this Court should address the issues raised in the petition to provide guidance for future CPRA requests related to drone video footage, especially to address its redaction obligations.

## DISCUSSION

### A. Standard of Review

"An order of the court, either directing disclosure by a public official or supporting the decision of the public official refusing disclosure, . . . shall be immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ." (§ 7923.500, subd. (a).) We "conduct an independent review of the trial court's ruling; factual findings made by the trial court will be upheld if based on substantial evidence." (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1336.)

### B. The CPRA

Enacted in 1968, the CPRA grants public access to public records held by state and local agencies. (§ 7920.000 et seq.) "Modeled after the federal Freedom of Information Act (5 U.S.C. § 552 et seq.), the [CPRA] was enacted for the purpose of increasing freedom of information by giving members of the public access to records in the possession of state and local agencies. [Citation.] Such 'access to information concerning the conduct of the people's business,' the Legislature declared, 'is a fundamental and necessary right of

---

[5]     Despite not being specifically referenced by the trial court, the parties agree that this additional reason articulated by the court was based on the catchall provision of the CPRA (§ 7922.000).

every person in this state.' " (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 290.)

Under the California Constitution, the CPRA must be "broadly construed" because its statutory scheme "furthers the people's right of access." (Cal. Const., art. I, § 3, subd. (b)(2).) Nevertheless, the act does not confer an absolute right of access. As part of the CPRA, the Legislature included a provision declaring it was "mindful of the right of individuals to privacy." (§ 7921.000.) This express policy declaration " 'bespeaks legislative concern for individual privacy as well as disclosure.' [Citation.] 'In the spirit of this declaration, judicial decisions interpreting the [CPRA] seek to balance the public right to access to information, the government's need, or lack of need, to preserve confidentiality, and the individual's right to privacy. [Citations.]' " (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1282 (*Copley Press*).)

The CPRA balances the dual concerns for privacy and disclosure by providing for various exemptions that permit public agencies to refuse disclosure of certain public records. (See, e.g., §§ 7927.200–7927.500.) For example, the CPRA does not require agencies to permit public inspection of records that are exempted or prohibited from public disclosure pursuant to federal or state law, including Evidence Code provisions relating to privilege. (§ 7927.705.) Also, as discussed *post*, law enforcement investigatory files typically are categorically exempt from the CPRA's general requirement of disclosure. (§ 7923.600.) " 'In large part, these exemptions are designed to protect the privacy of persons whose data or documents come into governmental possession.' " (*Copley Press*, *supra*, 39 Cal.4th at p. 1282.) CPRA exemptions are narrowly construed (*American Civil Liberties Union Foundation v. Superior Court* (2017) 3 Cal.5th 1032, 1042 (*ACLU*

9

*Foundation*)), and the agency opposing disclosure bears the burden of proving an exemption applies. (*Long Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59, 70; *County of Los Angeles v. Superior Court* (2012) 211 Cal.App.4th 57, 63.)

## C. Castañares's Contentions

Although Castañares raises multiple issues with the trial court's ruling,[6] his claims fall into two primary categories: (1) the trial court erred in finding all drone footage was categorically exempt as investigatory records under section 7923.600, subdivision (a), and (2) the City did not satisfy its burden under the catchall provision of the CPRA (§ 7922.000) to support

---

[6] Castañares challenges the trial court's order finding the City was justified in not producing the drone video footage on several grounds. First, he contends the court improperly construed the statutory exemptions broadly under the CPRA while narrowly construing his right to access the footage. Second, he asserts the drone video footage cannot be exempt as a matter of law without some showing that the footage was related to a law enforcement investigation and not a mere inquiry. Third, he claims the trial court's ruling is contrary to "the obvious intent of the Legislature to make police records as accessible to the public as possible (while still respecting the right to privacy)." Fourth, Castañares insists the ruling was improper because neither the City nor the trial court reviewed any of the drone video footage to determine whether any privacy rights would be implicated or threatened by the release of the footage to Castañares. As such, the court could not properly engage in the balancing required to determine whether the "catchall" provision of the CPRA (see § 7922.000) supported the City's decision not to disclose the drone video footage. Finally, Castañares maintains the trial court erred by faulting him for not being more specific in his CPRA request or pursing a less burdensome means of obtaining the desired information while not criticizing the City for failing to do more to help Castañares with respect to his request and for not providing facts to justify withholding of the drone footage in its initial response to Castañares's CPRA request. We need not resolve each of these challenges to decide the issues before us.

10

nondisclosure of the drone video footage.  We shall address each of these issues in turn.

### D.  The Investigatory Records Exemption

The CPRA "does not require the disclosure of records of . . . investigations conducted by . . . any state or local police agency, or any investigatory . . . files compiled by any other state or local police agency, or any investigatory . . . files compiled by any other state or local agency for . . . law enforcement . . . purposes." (§ 7923.600, subd. (a).)  The parties do not disagree that the investigatory records exemption applies to at least some of the drone video footage.  To this end, the parties stipulated below:  "Drone footage from calls for service that result in a law enforcement investigation (i.e., a case number was assigned) are exempt from public disclosure under . . . section 7923.600, subdivision (a) . . . unless the drone footage is otherwise discoverable."  Here, Castañares has not offered any argument that drone video footage that is linked to an actual investigation (at least to the extent that drone video footage is part of an investigatory file) should otherwise be disclosed in response to a CPRA request.  Accordingly, we are not concerned with the drone video footage that is part of an investigatory

11

file. Such files are exempt from disclosure. (See § 7923.600, subd. (a); *Black Panther Party v. Kehoe* (1974) 42 Cal.App.3d 645, 654.)[7]

Thus, we turn our attention to the drone video footage that is not part of an investigatory file. As a threshold matter, we note that drone video footage that falls under this category is not apparent on the record before us. Nor has such footage been identified or otherwise described in the record. Nevertheless, we shall endeavor to provide guidelines in considering such footage, cognizant of our high court's decree that investigatory records "are exempt on their face, whether or not they are ever included in an investigatory file." (*Haynie, supra,* 26 Cal.4th at p. 1069.)

Although there is no reported case dealing with a CPRA request seeking drone video footage, the City suggests that *Haynie, supra,* 26 Cal.4th 1061 is helpful to our analysis here. In that case, the petitioner claimed that he was injured by a Los Angeles County deputy sheriff during a traffic stop and sought certain public records regarding the incident. (*Id.* at p. 1065.) The sheriff's department refused to provide those records, instead disclosing a " 'summary of the event,' " which asserted that the deputy " 'received a call from a neighbor who saw several males carrying guns enter

---

7       This is not to say that a public agency can avoid disclosure under the CPRA simply by labeling certain information "investigatory." (See *Williams v. Superior Court* (1993) 5 Cal.4th 337, 356 ["[I]t now appears well established that 'information in public files [becomes] exempt as "investigatory" material only when the prospect of enforcement proceedings [becomes] concrete and definite' "].) "Such a qualification is necessary to prevent an agency from attempting to 'shield a record from public disclosure, *regardless of its nature,* simply by placing it in a file labelled "investigatory." ' " (*Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1069 (*Haynie*), citing *Williams,* at p. 355.) Here, Castanares does not argue that the drone video footage that is part of any investigatory file has been labeled as such merely to avoid disclosure.

12

an older model dark blue Ford van and travel down the road. The deputy spotted a vehicle matching that description five minutes later and he decided to conduct an investigation of the van.' " (*Id.* at pp. 1065–1066.) The department asserted that the "[r]ecords of . . . investigations" exemption mooted CPRA disclosure. (§ 7923.600, subd. (a).) Among other arguments raised, the petitioner responded that " 'records of investigations' should be defined so as to exclude investigations that are merely 'routine' or 'everyday police activity,' such as his traffic stop." (*Haynie*, at p. 1070.)

The California Supreme Court disagreed with the petitioner. (See *Haynie*, *supra*, 26 Cal.4th at pp. 1070–1071.) To that end, the court discussed the risk that the petitioner's proposed interpretation might pose to law enforcement operations. "Complainants and other witnesses whose identities were disclosed might disappear or refuse to cooperate. Suspects, who would be alerted to the investigation, might flee or threaten witnesses. Citizens would be reluctant to report suspicious activity. Evidence might be destroyed." (*Id.* at pp. 1070–1071.) Our high court also emphasized, however, that "by including 'routine' and 'everyday' within the ambit of 'investigations' in section [7923.600, subd. (a)], [it did] not mean to shield everything law enforcement officers do from disclosure. [Citation.] Often, officers make inquiries of citizens for purposes related to crime prevention and public safety that are unrelated to either civil or criminal investigations. The records of investigation exempted under section [7923.600, subd. (a)] encompass only those investigations undertaken for the purpose of determining whether a violation of law may occur or has occurred. If a violation or potential violation is detected, the exemption also extends to records of investigations conducted for the purpose of uncovering information surrounding the commission of the violation and its agency. Here, the

13

investigation that included the decision to stop [the petitioner] and the stop itself was for the purpose of discovering whether a violation of law had occurred and, if so, the circumstances of its commission. Records relating to that investigation are exempt from disclosure by section [7923.600, subd. (a)]." (*Haynie*, at p. 1071.)

Although *Haynie* provides some general principles to consider when assessing whether a CPRA request seeks records of investigations, we observe that the instant matter presents much different facts than *Haynie*. There, the court addressed a situation where an individual deputy stopped an individual driver, allegedly based on a single, close-in-time tip from a neighbor. In contrast, the instant matter does not concern an individual requesting information related to his encounter with law enforcement. Rather, the subject CPRA request here concerns over 91 hours of video footage related to a program utilized by the City's police department.[8] Further, unlike the request in *Haynie*, it is not related to a single event, involving the petitioner. Therefore, we conclude that *Haynie* gives us some guidance, but it does not, by itself, provide the necessary framework to answer the questions before us.

Not surprisingly, Castañares urges us to follow a different case, *ACLU Foundation, supra*, 3 Cal.5th 1032, which he claims is analogous to the instant action. There, the Los Angeles Police Department (LAPD) and the Los Angeles Sherriff's Department (LASD) employed automated license plate reader (ALPR) technology to locate vehicles linked to crimes under investigation. (*Id*. at p. 1036.) The ALPR data collection system used high-speed computer-controlled cameras mounted on fixed structures or on patrol

---

8    Castañares disputes whether the requested drone video footage actually runs over 91 hours.

14

cars. The cameras automatically captured an image of each vehicles' respective license plate that passed through their optical range. Using character recognition software, the ALPR system checked each license plate number against a list of license plate numbers associated with crimes, child abduction alerts, or outstanding warrants. If the ALPR system matched an image to a license plate on this list, the system would then alert officers in a patrol car or a central dispatch unit. However, most license plate numbers the ALPR units captured did not match the list and had no connection with any crimes, child abduction alerts, or outstanding warrants. (*Id.* at p. 1037.) As part of the ALPR program, each scanned license plate number, together with the date, time, and location of the scan, was stored on a confidential computer network. LAPD estimated that it recorded data from 1.2 million cars per week; LASD estimated that it recorded data from between l.7 and 1.8 million license plates per week. The data was retained for two years. (*Ibid.*)

The petitioners sent substantially identical requests to the LAPD and the LASD, seeking " 'records related to those agencies' use of ALPR technology, including "all ALPR data collected or generated" during a one-week period in August 2012, consisting of, "at minimum, the license plate number, date, time, and location information of each license plate recorded." ' " (*ACLU Foundation*, *supra*, 3 Cal.5th at pp. 1037–1038.) The LAPD and the LASD withheld the requested license plate scan data, claiming the information was exempt as law enforcement records of investigations under section 7923.600, subdivision (a). (*ACLU Foundation*, at p.1038.)

The petitioners filed a petition for a writ of mandate to compel disclosure of the requested ALPR data. The superior court ruled in favor of the agencies, finding that the requested data was exempt from disclosure as

15

records of investigations and was covered by the catchall provision under section 7922.000. (*ACLU Foundation*, *supra*, 3 Cal.5th at p. 1038.) The petitioners then sought issuance of an extraordinary writ in the Court of Appeal. However, the appellate court concluded the data was exempt from disclosure under section 7923.600, subdivision (a). (*ACLU Foundation*, at p. 1038.)

After granting review, our high court determined that the "process of ALPR scanning does not produce records of investigations, because the scans are not conducted as part of a targeted inquiring into any particular crime or crimes." (*ACLU Foundation*, *supra*, 3 Cal.5th at p. 1042.) The court further observed that "[t]he scans are conducted with an expectation that the vast majority of the data collected will prove irrelevant for law enforcement purposes." (*Ibid*.) The court acknowledged that it "may not always be an easy task to identify the line between traditional 'investigation' and the sort of 'bulk' collection at issue here[,]" but it was "clear that [the] . . . ALPR process falls on the bulk collection side of it." (*Ibid*.)

In determining that the investigatory records exception did not apply to the ALPR scans, the California Supreme Court considered the impact of querying the ALPR database for information on particular vehicles. The court concluded that such a query did not transform the ALPR records into exempt records of investigations. (*ACLU Foundation*, *supra*, 3 Cal.5th at p. 1042.) As such, the court made clear that "[a] plate scan in itself always remains a result of bulk data collection, rather than a record of investigation, even if it has the potential to match a future search query." The court noted a contrary rule would allow an agency to exempt data, "purportedly to

16

advance some more traditional 'investigation,' simply by searching the entire database." (*Ibid.*)[9]

Although Castañares claims the instant matter is analogous to *ACLU Foundation*, we observe a key difference between the two cases in considering whether the requested drone video footage falls under the records of investigations exemption of the CPRA. In *ACLU Foundation*, the ALPR scans were random and not aimed at any particular person or in response to any call to service from the public. In contrast, here, the drone video footage is recorded only after an officer determines a drone should be dispatched in response to a 911 call.[10] Thus, unlike the ALPR scans in *ACLU Foundation*, the drone video footage in the instant matter required an act of discretion by the City's police. This is a critical difference between the two programs and underscores why we are not persuaded that *ACLU Foundation* is instructive regarding the application of the records of investigations exemption here.

Therefore, the instant matter falls somewhere between *Haynie* (a targeted CPRA request based on a petitioner's interaction with a specific officer) and *ACLU Foundation* (the random collection of bulk data).

---

[9]    Our high court also addressed the applicability of the catchall provision of the CPRA to the ALPR data. (See *ACLU Foundation*, *supra*, 3 Cal.5th at pp. 1043–1047.) We will address this issue *post* and eschew a discussion of that portion of *ACLU Foundation* at this time.

[10]    Castanares contends the City's police department would dispatch drones "in response to calls ***passively*** heard via Live911." However, he does not explain the significance of this response or how it should impact our analysis. Thus, we deem any argument related to dispatching a drone in response to calls heard via Live911 to be forfeited. That said, we see no significant difference between the decision to dispatch a drone in response to a 911 call and the decision to dispatch a drone after hearing about a situation via Live911. The key issue under the CPRA remains the same: Was the drone dispatched to conduct an investigation?

Additionally, we are further guided by our high court's observation that "*Haynie* at least implies that an inquiry must be somewhat targeted at suspected violations of law (see *Haynie*, *supra*, 26 Cal.4th at p. 1071) to qualify as an 'investigation[ ]' under section [7923.600, subd. (a)]. The mere fact of an inquiry is not enough." (*ACLU Foundation*, *supra*, 3 Cal.5th at p. 1041.) As such, we envision three possible categories that the drone video footage can fall under in the instant action. The first category consists of drone video footage that is part of an investigatory file. As the parties agree, this footage would be exempt from disclosure under the CPRA per section 7923.600, subdivision (a).

The second category consists of instances where officers used a drone to investigate whether a violation of law was occurring or had occurred but did not create a corresponding investigatory file. (See *Haynie*, *supra*, 26 Cal.4th at p. 1071; *ACLU Foundation*, *supra*, 3 Cal.5th at p. 1041.) Examples of such use of drones include dispatching a drone to investigate a possible assault, a claim of someone causing a disturbance, or a suspected break in; yet, the resultant video footage did not become part of an investigatory file. Under *Haynie* and *ACLU Foundation*, drone video footage investigating these and other claims of crimes being committed would fall under the records of investigations exception. (See § 7923.600, subd. (a).)

The final category is any drone video footage that does not fall under categories one or two. Such footage would consist of using a drone to make a factual inquiry to determine what kind of assistance is required, not to investigate a suspected violation of law. For example, a 911 call about a mountain lion roaming a neighborhood, a water leak, or a stranded motorist on the freeway could warrant the use of a drone but do not suggest a crime might have been committed or is in the process of being committed.

18

Here, Castañares claims "much of the drone footage collected for the relevant time period did not relate in any way to an investigation." In other words, he argues *much* of the subject footage would fall under the third category we articulated *ante*. In support of his position, he notes the City dispatched drones to investigate brush fires (at least twice), a subject down on the ground, and a possible mental subject. Castañares further argues drones responding to these incidents did not appear to involve investigations into potential violations of the law.[11]

The City counters that the examples Castañares provides are, in fact, investigatory. Thus, the City notes that a brush fire could be the result of arson, a subject down might be a gunshot victim, and mental health checks often involve illicit drugs and reported violence.[12] Therefore, according to the City, all the instances that Castañares asserts are not investigatory

---

[11] We observe that Castañares has not supported his suggestion that "much of the drone footage collected . . . did not relate in any way to an investigation." Although not a precise word in terms of establishing an exact number, the word "much" means a great amount or quantity of. Here, Castañares has provided us with four examples of incidents that he believes would not qualify as investigations. There is evidence before us that the requested drone video footage for March 2021 consists of videos from about 370 responses to calls, and Castañares received call logs and AARs related to each of those flights. While we do not expect Castañares to create an exhaustive list of non-investigatory uses of a drone during March 2021, he should be mindful how he represents the record to this court. Even if we were to agree with Castañares that the examples he provided could not constitute investigations, four out of 370 calls responded to does not begin to suggest that a great quantity of the requested videos "did not relate in any way to an investigation." We appreciate zealous advocacy. However, hyperbole is not helpful to Castañares's position.

[12] The City's argument is well taken. That said, we note that some of the AARs use "arson" in the summary column while others use "fire." No explanation is provided for this difference.

require, at the outset, a police investigation to evaluate whether a crime was committed.

The City buttresses its argument by emphasizing its "police department dispatches drones only to investigate 911 calls, not patrol or surveil the City." Therefore, the City insists that its police force's response to 911 calls cannot be considered mere inquiries because "[p]olice respond to 911 calls to investigate potential crimes, and 'must take them seriously and respond with dispatch.'" And the City points us to the declarations of Miriam Foxx and Don Redmond in support of its position.

Foxx, a captain and member of the police department's command staff, declared:

> "Officers treat every call for service, at least initially, as a response to investigate . . . whether a potential crime occurred or may occur. Of course, that does not mean that every call for service results in an officer detecting a crime or an arrest, but every call has that potential, and an officer cannot rule out a crime or violation of the law without first conducting a preliminary investigation."

Redmond, a retired captain in the City's police department, stated:

> "Simply put, the Department uses drones to investigate calls for service, and no more. Moreover, any reasonable office[r] treats a call for service as involving a potential crime, and investigate[s] them as such until more facts become known and prove otherwise."

Consequently, relying on Foxx's and Redmond's declarations, the City argues that every response to a 911 call is investigatory.[13]

---

13    We observe that Foxx's and Redmond's declarations refer to how a reasonable officer would respond to a generic 911 call. Here, such generalities are unnecessary and not particularly helpful. There are AARs for every drone flight at issue. Thus, each instance can be evaluated to determine whether it was investigatory or a factual inquiry.

Furthermore, the City argues that *Haynie*, *supra*, 26 Cal.4th at page 1070 forecloses Castañares's argument in which he attempts to distinguish between the responses to different 911 calls.  We disagree with the City on this point.  In the portion of *Haynie* the City quotes, our high court was explaining the problems with the petitioner's request for a bright line rule that the records of investigations exemption should be defined as to exclude investigations that are merely " 'routine' " or " 'everyday police activity,' " like a traffic stop.  (*Ibid.*)  Thus, the court pointed out that "[l]aw enforcement officers may not know whether a crime has been committed until an investigation of a complaint is undertaken." (*Ibid.*)  And the court relied on examples of a cause of death determination or a suspicious fire in support of its explanation.  In both instances, the situations considered assumed the possibility of a crime committed (e.g., homicide or arson).  The court, however, was not considering the drone program at issue here or possible responses to hundreds of 911 calls.

Moreover, unlike our high court, we are not faced with a situation where a petitioner is asking us to craft a bright line rule excluding routine or everyday police activities from the records of investigations exemption.  Instead, we are engaged in a much more modest pursuit.  We are simply considering the possibility that a drone could be dispatched in response to a call to service from the public wherein the use of the drone could not be considered investigatory in nature.  As discussed *ante*, we can imagine such situations (e.g., potentially dangerous wildlife roaming the neighborhood, a stranded motorist, a water leak).  Based on these reasonable scenarios and the dictate that we broadly construe disclosure under the CPRA (Cal. Const., art. I, § 3, subd. (b)(2)) and narrowly construe exemptions (*ACLU Foundation*, *supra*, 3 Cal.5th at p. 1042), we conclude, based on the record

21

before us, the trial court's broad ruling that all drone video footage, as a matter of law, is categorically exempt because the drones are only dispatched in response to 911 calls was error.

Instead of adopting such an all-encompassing rule, we conclude a more nuanced approach to the drone video footage is apt. The drone video footage should not be treated as a monolith, but rather, it can be divided into separate parts corresponding to each specific call. Then each distinct video can be evaluated under the CPRA in relation to the call triggering the drone dispatch. Further, as an initial determination, the City is well equipped to categorize the drone video footage in this manner. However, we do not propose to instruct the City regarding what process it must use to evaluate the drone video footage or suggest that a City designee must watch the footage to make the necessary determinations. Indeed, it could be more efficient for the City to simply review call logs, AARs, and other related information to ascertain what drone video footage falls into the three categories. After the City categorizes the drone video footage, Castañares then should be permitted the opportunity to challenge or otherwise question any of the determinations the City made. To the extent the parties disagree on the categorization of the drone video footage, we trust the trial court to resolve those issues of disputed fact consistent with *Haynie, supra*, 26 Cal.4th 1061; *ACLU Foundation*, *supra*, 3 Cal.5th 1032; and this opinion. We offer no opinion regarding which subject videos fall into any of the three categories discussed *ante*.

E.  The Catchall Provision

The second issue before us is whether drone video footage that is not exempt under section 7923.600, subdivision (a) may nonetheless be withheld pursuant to the catchall exemption set forth in the CPRA. This exemption,

22

codified in section 7922.000, permits a public agency to withhold a public record under the CPRA if the agency demonstrates "that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." (§ 7922.000.) The catchall exemption " 'contemplates a case-by-case balancing process, with the burden of proof on the proponent of nondisclosure to demonstrate a clear overbalance on the side of confidentiality.' " (*ACLU Foundation*, *supra*, 3 Cal.5th at p. 1043.) "Whether such an overbalance exists may depend on a wide variety of considerations, including privacy . . . ; public safety . . . ; and the 'expense and inconvenience involved in segregating nonexempt from exempt information.' . . . In balancing the interests for and against disclosure, we review the public interest factors de novo but accept the trial court's factual findings as long as substantial evidence supports them." (*Ibid.*) "As the party seeking to withhold the record, the [City] bears the burden of justifying nondisclosure." (*County of Santa Clara v. Superior Court* (2009) 170 Cal.App.4th 1301, 1329.)

Below, the trial court concluded, as a separate reason for ruling in favor of the City, that Castañares's CPRA request, "as framed by petitioner and as 'tempered' by petitioner's redaction suggestion, seeks to impose an unreasonable burden on the City's resources with no substantial countervailing benefit given the wealth of information already turned over by the City to petitioner." To make this finding, the trial court compared the burden associated with the redactions of the drone video footage coupled with the privacy concerns of turning over the videos to a third party, as well as the abundance of information the City supplied in response to Castañares's CPRA request, to determine the catchall provision of the CPRA supported the City's decision not to turn over the drone video footage. The City argues the

23

trial court's findings are supported by substantial evidence; thus, we must accept those findings. (See *ACLU Foundation*, *supra,* 3 Cal.5th at p. 1043 ["In balancing the interests for and against disclosure, we review the public interest factors de novo but accept the trial court's factual findings as long as substantial evidence supports them"].)

Below, the City offered the declaration of Shannel Honoré, the police support services manager for the City's police department. Honoré explained that it takes a digital technician on average about an hour to redact three minutes of video footage, resulting in a ratio of 20 hours of redaction time to one hour of video. However, Honoré opined that the 20:1 ratio underestimates the actual time, and a 30:1 ratio would be more appropriate. She then pointed out that Castañares's CPRA request for all drone video footage from March 2021 encompasses 537 pieces of "digital evidence (videos), or 91 hours, 39 minutes, and 52 seconds of total drone footage." Consequently, applying the 20:1 ratio to the amount of video footage, Honoré declared that it would take 1833.3 hours or 229.2 workdays to simply review and redact the footage without the additional legal review, research, and quality control that would be necessary to evaluate privacy, safety, and legal concerns.

This need to redact the drone video footage is compelled by privacy concerns. As the trial court correctly noted, our state constitution expressly grants all Californians the right of privacy. (Cal. Const., art. I, § 1.) And here, we agree that the drone video footage implicates serious privacy concerns. It is undisputed that when a drone is dispatched, its video camera is turned on and is recording. As the drones travel en route to the various scenes, it logically follows that they would, from time to time, travel over and film private backyards, perhaps capturing pool parties, barbeques,

24

sunbathing, or other activities that are intended to be private.  (Cf. *Dean v. Superior Court* (1973) 35 Cal.App.3d 112, 117 ["One who builds a swimming pool and sunbathing area in his backyard expects privacy . . . from aerial inspection"].)  Additionally, a drone may record the face of a bystander or otherwise film some event where its participants had an expectation of privacy or would not want a third party, like Castañares, to see and possess a video of them.  Thus, the need to carefully review and redact the drone video footage is well supported.  (Cf. *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 24 ["The privacy tort seeks to vindicate multiple and different interests that range from freedom to act without observation in a home, hospital room, or other private place to the ability to control the commercial exploitation of a name or picture"].)

In addition, the City maintains that it produced a myriad of information in response to Castañares's CPRA request.  The record substantiates this assertion.  Among other documents, Castañares received anonymized flight telemetry for *every* drone flight in March 2021, which included the date and time of the flight, a case/incident number, location, and summary of the reason for dispatching the drone.  He also received AARs, which corresponded to case/incident numbers and provided more detail about the reason a particular drone was dispatched.[14]  Additionally, the City produced documents about operating the drones, the drone program in general, and City meeting minutes.

---

[14]    For example, a drone was dispatched on March 27, 2021 at 2:30 p.m. in response to a call about a person down.  The corresponding AAR states:  "Call heard via Live911 regarding an elderly male who fell down and appeared to need help.  [The drone] was on scene prior to units and CVFD [Chula Vista Fire Department] was already on scene tending to the subject.  Units were advised."

In mounting his substantial evidence challenge, Castañares's primary argument is that no one (neither the City nor the trial court) actually reviewed any of the subject drone video footage. Thus, he characterizes the City's claim regarding the length of the video footage as an estimate[15] and the time needed to review and redact as an assumption. He then asserts, "[t]here is nothing in the record to support that review of the drone footage is one-to-one and could not occur more quickly." To this end, without citation to any evidence in the record, he claims the video footage might be able to be reviewed at two or three times normal speed and concludes, "[r]eviewing digital material at a fast clip is commonplace and analogous to reviewing a paper document by quickly scanning its contents for exempt material, verses reading each and every word on each page."

Despite the lack of any evidence to support Castañares's bald assertions, the fact that the City's primary argument concerns its burden of reviewing and redacting drone video footage it has not seen gives us pause. Nonetheless, we conclude that the parties' respective arguments here are off the mark. Both sides assume that the catchall provision of the CPRA needs to be applied to the entire drone video footage at issue. That assumption is incorrect. Because of the application of the records of investigations exemption to the drone video footage, the catchall provision does not and should not be applied to all 91 hours, 39 minutes, and 52 seconds of footage.

As we discussed *ante*, the investigation of records exemption (§ 7923.600, subd. (a)) applies to at least two of the three categories of drone video footage— footage that is part of an investigatory file and investigations.

---

15    Although the City does not refute Castañares's accusation that it did not watch any of the subject drone videos, the City invites us to "verify [its] calculation" of the length of video footage by reviewing the videos it lodged with the trial court under seal. We decline the City's invitation.

Video footage falling under either of those two categories is exempt from disclosure. Therefore, the catchall provision of the CPRA need only be applied to the videos that fall into the third category—factual inquiries. However, on the record before us, we do not know what portion of the total drone video footage corresponds to the non-exempt inquiries. Accordingly, even if we were to accept the City's evidence regarding the amount of time it would take to review and redact the video footage, we cannot evaluate the related burden without knowing the amount of footage in need of redaction.

Although the City's burden of disclosure (here, primarily review and redaction time) is not the only factor we consider in analyzing the applicability of the catchall provision, it is central to the City's argument. And because of the importance the City places on that factor and the lack of the development of the record allowing us to evaluate it, we must conclude that the City did not carry its burden in showing the catchall provision applies here.

F. Conclusion

In summary, we conclude the trial court erred in determining, on the record before it, that all drone video footage was exempt from disclosure under the CPRA. In addition, we find that the City did not carry its burden to show that the CPRA's catchall provision supports its decision not to disclose the requested drone video footage. Therefore, we remand this matter back to the trial court for further proceedings consistent with this opinion. Specifically, we suggest that the trial court ask the City to separate the requested drone video footage into three categories: (1) part of an investigatory file, (2) an investigation into whether a law has been broken absent any investigatory file; and (3) a factual inquiry. The first two categories are exempt from disclosure under section 7923.600,

subdivision (a).[16]  The third category is not.  For the footage that falls under the third category, the City may then offer arguments as to why the catchall provision applies.[17]  Regarding the catchall provision analysis, we note that it might be sensible for the City to at least review a sampling of the remaining videos so it can more accurately represent the burden of redacting such videos and the privacy rights implicated in disclosing them to Castañares.  We offer no opinion regarding what portion of the subject drone video footage is covered by the records of investigations exemption (§ 7923.600, subd. (a)) or whether the catchall provision (§ 7922.000) applies to any non-exempt footage.

---

[16]  As we discussed *ante*, the trial court may resolve any disputes regarding the characterization of the drone video footage.

[17]  Although not articulated in the petition here, we are aware that, at some point below, Castañares claimed that he might be entitled to portions of drone video footage that would be considered investigatory as long as that video footage does not actually depict the alleged crime being investigated (i.e., the video footage of the drone traveling to and from the investigation scene).  We offer no opinion regarding whether such portions of the drone video footage should be disclosed under the CPRA.  Nonetheless, on remand, if Castañares makes such an argument and persuades the trial court he is correct, then the City should be permitted to argue that the catchall provision applies to those videos as well.

## DISPOSITION

We grant, in part, the relief requested in the petition for extraordinary relief. We thus remand this matter to the superior court with instructions to vacate the April 10, 2023 minute order and to conduct further proceedings consistent with this opinion. We grant none of the other requested relief. Pursuant to California Rules of Court, rule 8.493(a)(1)(B), the parties shall bear their own costs in this proceeding.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

DO, J.